RICHARDS v. BIRMINGHAM SCHOOL DISTRICT.

1. Trial—Special Finding—General Verdict.

A special finding of facts, if based on competent evidence, con-- trols over an inconsistent general verdict (CL 1948, § 618.39).

2. Negligence — Proximate Cause — Special Question — General. Verdict.

Plaintiff in action for injuries sustained when bleachers at a football game collapsed and who made no objection to form of special question "Do you find that *the* proximate cause of the fall of the bleacher section in which * * * plaintiff was sitting was a sideward thrust or lateral force applied thereto by a sideward movement of the adjoining bleacher sections" at time the question was submitted to the jury, may not thereafter question the action of the court in submitting it, notwithstanding the existence of the well-established rule that there may be more than 1 proximate cause for injuries received under such circumstances, the question submitted not being ambiguous (CL 1948, § 618.39).

3. Same—Proximate Cause—Collapse of Bleachers—General. Verdict—Special Question.

Claim that general verdict for plaintiff may be reconciled with special question as to "*the* proximate cause" in action for personal injuries sustained in collapse of bleachers at football

---

References for Points in Headnotes
[1, 3] 53 Am Jur, Trial § 1083.
[2] 53 Am Jur, Trial § 1063 *et seq.*

playing field belonging to defendant *held*, untenable, where negligence charged defendant related solely to erection and inspection of bleacher section in which plaintiff was sitting and finding under special question was that *the* proximate cause of such section collapsing was by reason of a sideward thrust from adjoining bleacher section collapsing toward bleacher section where plaintiff sat.

SMITH and EDWARDS, JJ., dissenting.

Appeal from Oakland; Holland (H. Russel), J. Submitted October 11, 1956. (Docket No. 64, Calendar No. 46,672.) Decided June 3, 1957.

Case by Maurice Richards against the School District of the City of Birmingham for injuries sustained in collapse of temporary bleachers at football game. Judgment for defendant *non obstante veredicto*. Plaintiff appeals. Affirmed.

*Martin & Martin* (*Walter Martin,* of counsel), for plaintiff.

*Howlett, Hartman & Beier,* for defendant.

CARR, J. Plaintiff herein is, and for a number of years past has been, a practicing dentist in the city of Royal Oak. On November 25, 1948, which was Thanksgiving Day, he attended a football game between teams representing the high schools of Royal Oak and Birmingham, the game being played on the athletic field of the latter district. In preparation for the game said defendant had leased from a co-partnership doing business as the Atlas Portable Bleacher Company several bleachers to be used at the game in conjunction with other bleachers previously erected. At the time in question the athletic field was surrounded by a fence, with ticket offices on the west side and at the southeast. Plaintiff, and friends who accompanied him, procured tickets short-

ly before the scheduled time for the game and entered the field. They took their places on one of the leased Atlas bleachers which was located on the east side of the field at or in proximity to the north 30-yard line, if extended, of the playing field.

A few minutes before the starting of the game the bleacher on which plaintiff was seated, with other bleachers adjacent thereto, collapsed, as a consequence of which plaintiff sustained serious physical injuries. This action was instituted against the Birmingham school district and the copartners, doing business as the Atlas Bleacher Company, George B. Post and Georgiana Stringham, to recover damages. The declaration filed charged that the copartners were guilty of negligence in that the bleachers which they rented to the school district were improperly and negligently constructed. It was further alleged that the district, which by the leasing contract had assumed responsibility for the erection of the bleachers, was negligent in so doing in that due care was not exercised in the process. It was plaintiff's theory as evidenced by his pleadings and proofs that the injuries sustained by him were the proximate result of the concurrent negligence of the defendants.

A motion to dismiss the declaration was made by defendant school district on the ground that under the facts alleged in the pleading there was no liability on its part. The other defendants presented a motion of like character, claiming that there was a misjoinder of parties. Both motions were denied, but without prejudice. Defendants filed answers to plaintiff's declaration, denying liability, and the parties proceeded to trial before a jury. In support of his claims as set forth in the declaration, proofs were offered on behalf of plaintiff with reference to the construction of the so-called Atlas bleachers and the manner in which they were erected by the school

district. Witnesses, including plaintiff, testified as to the condition of the ground beneath said bleachers, indicating that it was wet, possibly to the extent of being muddy, at the time of the game, and that proper planking or other base support was not placed beneath the bleachers in order to prevent tilting. A mechanical engineer, called as an expert, gave testimony with reference to the construction of the Atlas bleachers, with particular reference to the ability thereof to withstand stress and strain, and the possible results of improper erection. Proofs were also introduced as to the nature and extent of plaintiff's injuries.

After plaintiff had rested his case defendants moved for directed verdicts. The record indicates that said motions were based, at least in part, on the same grounds as were the previous motions that were denied without prejudice. Said motions for directed verdicts were taken under advisement by the trial judge,* whereupon defendants proceeded with their proofs. Several witnesses testified, in substance, that to the north of the Atlas bleachers, on one of which plaintiff was seated, were other bleachers referred to in the record as "Leavitt bleachers," that the trouble originated in the latter bleachers, which collapsed toward the south causing the Atlas bleachers to likewise collapse. The movement was compared by one witness to a "slow motion" picture, and by others likened to a row of dominoes falling in succession. It was also described as a "wave," progressing toward the south.

A detailed discussion of the testimony given by each witness would serve no useful purpose. It was the theory and claim of the defendant school district that the collapse of the bleacher on which plaintiff was seated, and his consequent injuries, resulted

---

* See CL 1948, § 691.691 (Stat Ann 1955 Cum Supp § 27.1461).— REPORTER.

directly from the failure of the Leavitt bleachers. Testimony was further introduced that the people on the bleachers, particularly on the Leavitt bleachers, started a rhythmic moving or swaying in keeping with calisthenics in which the players on one of the football teams were engaged, and that this movement resulted in the collapse of said bleachers.

In submitting the case to the jury the trial judge carefully set forth in detail the claims of the parties with reference to the reasons for the occurrence in which plaintiff suffered his injuries. The term "proximate cause" was defined and explained. The jury was told that:

"It is the plaintiff's claim in this case that the proximate cause of his injury was lack of ordinary care on the part of the agents of the Birmingham school district either in the erection of the Atlas bleacher on which the plaintiff was sitting or in the inspection or in both such erection and inspection. Thus, if you should find by a fair preponderance of the evidence that the bleacher on which Doctor Richards was sitting went down not because of faulty erection or inspection but because of a lateral force applied to it from the side by the falling of other adjoining bleachers which in turn were forced down by the failure of an entirely different make of bleacher, to-wit, a Leavitt bleacher, then the proximate cause of the plaintiff's injury would not be the negligence claimed by the plaintiff in its declaration and your verdict would be one of 'no cause for action.' "

At the request of defendant school district the following special question was submitted with questions, not material at this time, presented by the other defendants:

"Do you find that the proximate cause of the fall of the bleacher section in which Dr. Richards, the plaintiff, was sitting was a sideward thrust or lat-

eral force applied thereto by a sideward movement of the adjoining bleacher sections, which sideward thrust or lateral force resulted from a sideward movement of one or more Leavitt bleacher sections at the north end of the east side of the football field?"

The jury returned a general verdict for plaintiff in the sum of $45,000 against the defendant school district, finding that the other defendants were not liable. The special question above quoted was answered in the affirmative. Thereupon defendant school district moved for judgment notwithstanding the verdict, claiming, 1st, that the answer to the special question was inconsistent with the general verdict; 2d, that the verdict in plaintiff's favor was based on speculation and conjecture; and, 3d, that the school district of the city of Birmingham, as a *quasi*-municipal corporation, was immune from liability. The trial court concluded that plaintiff had made out a prima facie case by his proofs, and that the 2d reason urged in support of the motion was not well-founded, but that the defendant district was entitled to judgment on the basis of the 1st and 3d reasons advanced, that is, inconsistency between the answer to the special question and the general verdict and immunity from liability for damages under the facts in the case. Judgment was accordingly entered in favor of the defendant district. From such judgment plaintiff has appealed.

The submission of special questions to a jury in the trial of cases of the character here involved is provided for by CL 1948, § 618.39 (Stat Ann § 27.-1019), which reads as follows:

"In all cases where an issue of facts is tried before any court of record, the court shall at the request in writing, of the counsel of either party, in-

struct the jury if they return a general verdict, also
to find upon particular questions of facts, respect-
ing which the issue is joined, to be stated in writ-
ing, and shall direct a written finding thereon:
Provided, such special questions shall not exceed
5 in number, and shall be each in single, short sen-
tences, readily answered by yes or no. The special
verdict, or finding, shall be filed with the clerk,
and entered upon the minutes, and when any special
finding of facts shall be inconsistent with a general
verdict, the former shall control the latter, and the
court give judgment accordingly."

The object sought to be attained by the section
quoted was stated in *Mitchell* v. *Perkins,* 334 Mich
192, 206, as follows:

"The purpose of special questions is to enable the
court to learn what view the jury takes of the ma-
terial issues and their ability to make correct in-
ferences from existing facts. See *Cole* v. *Boyd,* 47
Mich 98; *Durfee* v. *Abbott,* 50 Mich 479; and *Hart-
ley* v. *A. I. Rodd Lumber Co.,* 282 Mich 652."

The language of the statute is clear and specific
as to the effect to be given by an answer to a proper
special question when such answer is at variance
with the general verdict returned. As indicated in
the above quotation from the *Mitchell Case,* the pro-
cedure furnishes a method by which the trial court
may determine whether the verdict has been prop-
erly reached in accordance with the facts as found
from the testimony. The scope of the statute was
recognized in *Finch* v. *W. R. Roach Co.,* 299 Mich
703, 711, in the following excerpt from the opinion:

"Counsel for appellant has not discussed what
consideration, if any, should be given to the special
questions submitted to the jury and the answers of
the jury thereto. These questions hereinbefore
quoted were submitted to the jury by the court upon
request of defendant. They were plain and unam-

biguous and called for findings on questions of fact which were conclusive of the real issues involved in this case. The answers, above noted, to the questions so submitted by defendant's request, if based upon any competent evidence, are binding upon defendant and are conclusive of the issues involved in the instant case. *Pajalich* v. *Ford Motor Co.*, 267 Mich 418; *Wuerth* v. *Stivers*, 273 Mich 276; *Beecher* v. *Galvin*, 71 Mich 391."

See, also, *Nantico* v. *Matuszak*, 322 Mich 644.

Counsel for plaintiff call attention to the well-established rule that there may be more than 1 proximate cause for injuries received under circumstances analogous to those in the case at bar. However, the special question referred to the proximate cause, and the proofs introduced by the defendant school district were obviously offered in support of its claim that such cause was the failure of the Leavitt bleachers to withstand the strain placed on them, rather than any negligence on its part in the erection of the Atlas bleachers leased from the other defendants in the case. The excerpt above quoted from the charge to the jury indicates that the trial judge had defendant's theory and claim in mind. It may be assumed that the jury recognized the positions of the parties to the case, as well as the charge of the court. It may be noted further that no objection was made to the form of the special question involved prior to its submission to the jury.

In *Sedorchuk* v. *Weeder*, 311 Mich 6, the difference in meaning between the expressions "the proximate cause" and "a proximate cause" was clearly recognized. There the trial court in submitting the case to the jury used the first phrase throughout his charge. This was held to be error, and the judgment entered on a verdict in defendant's favor was reversed and a new trial ordered. The distinc-

tion between the 2 forms of expression was also recognized in *Elias* v. *Hess*, 327 Mich 323.

Having made no objection to the submission of the special question here involved, counsel for plaintiff are not now in position to question the action of the court in submitting it. Clearly it was not ambiguous in form. The term "the proximate cause" is not ambiguous, and from the charge of the court it must be assumed that the jury understood its meaning. In its construction we are not at liberty to substitute the general article "a" for the definite article "the." To do so would involve the changing of the meaning of the question.

It is contended on behalf of plaintiff that the general verdict may be reconciled with the answer to the special question on the theory that the negligence of the school district in the erection and maintenance of the Leavitt bleachers was involved in the case. It is insisted that the declaration should be construed as charging such negligence. With this contention we are unable to agree. The pleading does not in terms refer to the Leavitt bleachers nor to the conditions under which, or the manner in which, said bleachers were erected. The parties supplying the Atlas bleachers were joined as parties defendant, and plaintiff charged them with negligence in the construction of the bleachers as well as claiming negligence against the school district in the erection thereof. The averments of the 3d count of the amended declaration are particularly significant, said count being based on the contract between the copartners, doing business as the Atlas Portable Bleacher Company, and the school district, in accordance with which the Atlas bleachers were leased to the latter. There is no chance for argument with reference to the bleachers referred to in the 3d count, nor does it appear that the preceding counts, insofar as the duties of the defendants were

concerned, had reference to bleachers other than those furnished by defendants Post and Stringham for the use of the other defendant.

The case was tried on the theory of plaintiff's amended declaration, and in the light of the issues raised by the answers thereto. The proofs offered by plaintiff, including the testimony of the expert, above mentioned, related to the construction and erection of the Atlas bleachers. In denying plaintiff's allegations of negligence in the erection of said bleachers, it was not incumbent on the school district to set forth its theory as to the proximate cause of the bleacher collapse. It does not appear that any objections to the proofs introduced by defendant district were made on the ground that its answer to the amended declaration was insufficient to permit the receiving of the proofs offered because of the omission to set forth in the answer in affirmative form the theory and claim of said defendant as advanced on the trial. It may be noted further, in the consideration of the arguments advanced on behalf of plaintiff, that the record contains no proofs to support a finding, or an inference, that the lateral force exerted against the bleacher on which plaintiff was seated would not have caused it to collapse had it been erected in accordance with the details that plaintiff insists should have been observed. The trial court correctly held that under the record in the cause the answer to the special question was inconsistent with the general verdict returned, and that in accordance with the mandate of the statute such answer was controlling with reference to the entering of judgment. We are in accord with his conclusions relating to the issues presented in the case by the pleadings and the proofs.

This brings us to the question whether the defendant school district is immune from liability in the instant case because of its status as a govern-

mental agency. The rule has been repeatedly recognized in Michigan that a municipal corporation is not liable for the negligence of its agents engaged in the performance of a purely governmental function. In the early case of *City of Detroit* v. *Blackeby*, 21 Mich 84 (4 Am Rep 450), the question involved was the liability of the city for injuries resulting from the defective condition of a crosswalk. Such liability was not expressly imposed by any statutory provision then in effect. It was held that there was no liability on the part of the municipality because of the failure of its employees to perform their duty. In writing for the Court, Chief Justice Campbell said (p 113):

"It has also been uniformly held in New York, as well as elsewhere, that public officers, whose offices are created by act of the legislature, are in no sense municipal agents, and that their neglect is not to be regarded as the neglect of the municipality, and their misconduct is not chargeable against it unless it is authorized or ratified expressly or by implication. This doctrine has been applied to cities as well as to all other corporations." (Citing cases.)

Justice Cooley, who dissented from the conclusion of the Court on the ground that the special legislative charter of Detroit granting to the city certain powers had imposed on it corporate duties, the violation of which might give rise to liability, acquiesced in the conclusion indicated in the opinion of the Chief Justice, saying (pp 118, 119):

"I concur fully in the doctrine that a municipal corporation or body is not liable to an individual damnified by the exercise, or the failure to exercise, a legislative authority; and I also agree that the political divisions of the State, which have duties imposed upon them by general law without their assent, are not liable to respond to individuals in

damages for their neglect, unless expressly made so by statute. Upon these 2 points the authorities are generally agreed, and the result is well stated in the opinion of the Chief Justice."

The doctrine of the *Blackeby Case* has been recognized in subsequent decisions, among which are *Butler* v. *City of Grand Rapids,* 273 Mich 674; and *Royston* v. *City of Charlotte,* 278 Mich 255. In the *Butler Case* it was held that the motor vehicle law of the State then in effect could not be construed as imposing liability on the city because of the negligent operation of a police cruiser, the driver of which was at the time engaged in performing a governmental function. It was declared that such liability was not imposed at common law and that the legislature had not in the motor vehicle code clearly indicated an intent to change the common-law rule. In the *Royston Case* the defendant city was held not liable for injuries resulting from maintaining a swing, installed in a public park in connection with other playground equipment, in a condition unsafe for use. In these cases no proprietary function was involved.

Plaintiff in the case at bar relies on the decision in *Foss* v. *City of Lansing,* 237 Mich 633 (52 ALR 185). There the defendant city, pursuant to resolution approved by vote of the electors, established a municipal garbage collection service, a fee of $1 per annum being specified by action of the city council as a charge for the use of cans or containers. To provide a means of disposing of the garbage the city purchased land outside the corporate limits, finally establishing on the property a piggery wherein the garbage was fed to hogs that were sold when ready for marketing. While returning to the city after conveying garbage to the piggery, a truck operated by a city employee collided with plaintiff's

automobile. The suit was brought on the ground that the driver of the truck was negligent, and that the city was liable therefor. It appeared in the case that defendant realized a profit which was used to reduce the cost of garbage disposal. Under these circumstances this Court concluded that the city might be held liable, in the same manner as would a private corporation. Judgment in defendant's favor, entered on a directed verdict, was reversed and a new trial granted.

In support of the conclusion reached in the *Foss Case* the opinion rendered cited *Rowland* v. *Kalamazoo Superintendents of Poor,* 49 Mich 553, in which the suit was based on a claim of damages suffered by plaintiff because defendants had wrongfully permitted the communication of a contagious disease to plaintiff's hogs. The alleged wrong was committed, as it was claimed, in the operation of a farm by the defendants from which some profit was realized. The liability of defendants was recognized. The *Foss* opinion also cited *Ostrander* v. *City of Lansing,* 111 Mich 693, in which the plaintiff was injured by the caving in of a sewer. Liability was claimed because of a provision of the charter of the city authorizing the making of an annual charge to persons whose premises were connected by private drains to the public sewer system. It is interesting to note that the language in the *Ostrander Case* was based on the holding in *City of Detroit* v. *Corey,* 9 Mich 165 (80 Am Dec 78), in which was involved a provision of the charter of Detroit similar in nature to the charter provision of the city of Lansing, to which reference was made. In the *Corey Case* it was said (p 184):

"It is also to be observed that the power under which they acted, and which made that lawful which would otherwise have been unlawful, was not a power

given to the city for governmental purposes, or a public municipal duty imposed on the city, as to keep its streets in repair, or the like, but a special legislative grant to the city for private purposes. The sewers of the city, like its works for supplying the city with water, are the private property of the city—they belong to the city. The corporation and its corporators, the citizens, are alone interested in them—the outside public or people of the State at large have no interest in them, as they have in the streets of the city, which are public highways."

It thus appears that in the final analysis the language in the *Ostrander Case* was predicated on the theory that the city of Lansing was in effect exercising not a strictly governmental function but one proprietary in character.

A similar situation existed in *Hodgins* v. *Bay City*, 156 Mich 687 (132 Am St Rep 546), likewise cited in support of the conclusion reached in the *Foss Case*. It was there recognized that it was within the power of the legislature to grant to municipalities the right to furnish light and water to the public generally. Plaintiff's intestate was electrocuted by coming in contact with a wire erected and operated by defendant as a part of its system for the transmission of electric current. It was held that the city could not be held responsible insofar as wires used in the transmission of electric current to the public lighting system was concerned, but that it would be liable for negligence in the maintenance of wires transmitting current for sale to purchasers. Here again the proprietary function was recognized, the Court referring to the *Ostrander Case, supra,* in such manner as to indicate that the decision there was based on the fact that in the construction of the sewer in question the city was exercising "its local governmental functions."

It is of interest to note the comment made by this Court in *Johnson* v. *Ontonagon County Road Commissioners*, 253 Mich 465, with reference to the *Foss Case* and the prior decisions cited therein. In the *Johnson Case* plaintiff sought to recover damages for injuries sustained as a result of being struck by a snowplow operated by an employee of defendant board on trunk line M–26 in Ontonagon county. The work was being done by defendant under contract with the State highway commissioner. Said contract provided for payments determined on a cost-plus basis, and plaintiff in the case insisted that because some incidental profit was realized, or might have been realized, from the snow removal operation, defendant should be held liable under the apparent theory of *Foss* v. *City of Lansing, supra.* In rejecting this claim, it was said (pp 471, 472):

"On this phase of the case it may also be noted that municipal corporations and other governmental agencies when performing a purely governmental function do not lose their immunity from liability for its negligent performance merely because they derive an income therefrom, provided the income is only incidental to the main purpose of so functioning and aimed at covering the cost of the undertaking. *Curran* v. *City of Boston*, 151 Mass 505 (24 NE 781, 8 LRA 243, 21 Am St Rep 465); *Bolster* v. *City of Lawrence*, 225 Mass 387 (114 NE 722, LRA1917B, 1285); *Bell* v. *City of Cincinnati*, 80 Ohio St 1 (88 NE 128, 23 LRA NS 910). On the other hand, a municipality may be held to respond in damages for the negligent act of its agent or employee incident to a voluntary activity undertaken for its own profit and commercial in character. *Bolster* v. *City of Lawrence, supra.* In *Gunther* v. *Board of Road Commissioners of Cheboygan County*, 225 Mich 619, 621, this Court said:

" 'The underlying test is whether the act is for the common good of all without the element of special

corporate benefit or pecuniary profit. If it is, there is no liability; if it is not, there may be liability. That it may be undertaken voluntarily and not under compulsion of statute is not of consequence.' (*Bolster* v. *City of Lawrence, supra.*)

"We find nothing in this record indicating that defendant was engaged in an enterprise which inured especially to its own corporate benefit. Instead, all of its activities had to do with the construction or maintenance of the public highways, which is the performance of a public duty. In the cases relied upon by plaintiff a very different situation is presented. In *Rowland* v. *Kalamazoo Superintendents of Poor,* 49 Mich 553, the defendant county superintendents of the poor were engaged in farming; and in the *Foss Case,* defendant was engaged in buying, fattening, and selling hogs. In *Ostrander* v. *City of Lansing,* 111 Mich 693; and *Hodgins* v. *Bay City,* 156 Mich 687 (132 Am St Rep 546), the defendants were engaged in matters relating to local government, and at least in the latter case derived an income therefrom. There are other cognate cases which are readily distinguishable in like manner. We are mindful that plaintiff here asserts that defendant conducted a garage where its road machinery was repaired; but this activity was also confined solely to its use in connection with the public work."

It is significant to note that the opinion in the *Johnson Case* was signed by all members of the Court, 4 of whom had also signed the opinion in the *Foss Case.* Particularly significant is the reference to the *Foss Case* as one involving the "buying, fattening, and selling hogs," and to the *Rowland Case* as one involving a farming operation. Such references suggest that in each case there was added to a function strictly governmental in character an additional operation that was essentially proprietary. With particular reference to the *Foss Case* it may be said that the city of Lansing, insofar as

the collection and removal of garbage from within the city was concerned, was performing a public duty, in other words, exercising a governmental function, but that in the operation of the piggery it was, in effect, operating in a proprietary character in the same manner as a private corporation might have acted. The decisions therein relied on, as well as certain statements in the opinion, support such theory, and the references thereto in the *Johnson Case* are in accord. That the functions involved in the *Ostrander* and *Hodgins Cases* were of such character is, we think, scarcely open to question. It may be noted also that the prevailing opinion in *Matthews* v. *City of Detroit,* 291 Mich 161, rested on the basis suggested. There the defendant was held liable for negligence of its employee in the operation of a miniature train used in connection with a zoological park. A small fare was charged visitors for riding on the train. In affirming, by an equally divided Court, a judgment for plaintiff, it was said (pp 167, 168):

"It is our conclusion that while the city of Detroit was maintaining the zoological park in its purely governmental capacity, nevertheless in its operation of the miniature railroad, with a resultant profit therefrom, it was exercising a proprietary function; and was liable for negligence arising from such operation."

School districts organized under the statutes of this State are created for the specific governmental purpose of carrying out the constitutional powers and duties vested in the State legislature with reference to education and the maintenance of common schools and institutions of higher learning. In *Daniels* v. *Board of Education,* 191 Mich 339 (LRA1916F, 468), plaintiff, a boy approximately 8 years of age, was injured as the result of falling in a school build-

ing from a stairway claimed to have been improperly safeguarded for use by children. A demurrer to the declaration in the case was sustained and on appeal this Court affirmed the action of the trial court, commenting in its opinon on the status of the defendant school district in particular and other districts of the State in general. It was there said, in part (pp 346, 347):

"We find nothing in this act enlarging the powers of the board beyond that of a pure governmental agency created and restricted in its authority exclusively to the public purpose of education, universally recognized as a distinctive governmental function. If it were a municipal corporation proper, its functions would be both governmental in administering delegated powers of the State and, to a larger extent, municipal, or to govern, manage, and regulate local affairs within the limits of the city, village, or district incorporated, the latter frequently including business activities for profit in operating public utilities in the interest and for the well-being of the community. Not only is no authority given to the school board to exercise municipal functions, but its limited powers are exclusively restricted to purposes of education. Although invested with certain corporate characteristics to more efficiently serve the purpose for which they are created, school districts are not municipalities, nor public corporations in the full sense, but because of their very restricted powers are distinguished and recognized as *quasi* corporations. That a district is organized under a local act, that the school property of the district is held in its name, and that it may sue or be sued does not enlarge it from a *quasi* corporation. *Attorney General, ex rel. Kies,* v. *Lowrey,* 131 Mich 639; *Whitehead* v. *Board of Education of Detroit,* 139 Mich 490."

The reasons supporting the decision in *Daszkiewicz* v. *Detroit Board of Education,* 301 Mich 212, support

the conclusion of the trial judge in the case at bar. There the administrator of the estate of a young man, who had been a student in the college of medicine operated by defendant in connection with Wayne University, sued to recover damages because of the death of his intestate, due, as it was alleged, to negligence on the part of defendant's employees. At the conclusion of the testimony in the case motion for a directed verdict was made by defendant, the motion was taken under advisement, and the cause submitted to the jury. Verdict in favor of defendant was returned, and the court denied a subsequent motion for a new trial. It was the contention of the plaintiff, on appeal from the judgment entered, that the defendant in operating the public schools of the city of Detroit was performing an exclusively governmental function, but that in operating the medical school it was engaged as a *quasi* municipality in a proprietary enterprise and, therefore, liable for the negligence of its employees because of the fact that the payment of tuition for attending said school was required. This Court, however, rejected the claim, citing and quoting from *Johnson* v. *Ontonagon County Road Commissioners, supra,* and, saying, further (pp 222, 223):

"The rule is generally recognized that a governmentally sponsored educational institution does not lose its immunity from tort liability by collecting tuition fees to assist in defraying the cost of such institution. *Davie* v. *University of California Board of Regents,* 66 Cal App 693 (227 P 243); *Nabell* v. *City of Atlanta,* 33 Ga. App 545 (126 SE 905); *Todd* v. *Curators of University of Missouri,* 347 Mo 460 (147 SW2d 1063)."

This decision must be construed as a clear recognition of the proposition that a school district created under the laws of the State of Michigan is not liable

for the negligence of its employees even though income is received from tuition charged certain pupils. Obviously, the acceptance of a contrary theory would result in the diversion of moneys raised by taxation for school purposes in any instance where such tuition is charged.

In the case at bar the defendant school district maintains a physical education department as a part of its facilities, and in connection therewith fosters and promotes athletics, including football, baseball, basketball, track and other activities. This is done in accordance with regulations of the State department of education, and as a part of the educational program of the defendant school district. It is not disputed that such activities have a proper place in education and in the physical and mental development of students. It is conceded that defendant has charged admission to football and baseball games, other athletic contests apparently being open to the public generally without charge.

An exhibit introduced by defendant district on the trial of the case, without objection, which exhibit was prepared by certified public accountants, discloses that the athletic activities program of the defendant school district for the year ending June 30, 1949, resulted in a net operating loss. The football game played on November 25, 1948, must be considered as a part of the athletic activities of the school rather than as an independent contest. It thus appears that such activities of the physical education department did not, for the year in question, result in a net profit. On the record in the case it may not be claimed that such activities are carried on for the purpose of making money for the benefit of defendant school district. Rather, the entire department is operated as a part of the school facilities and in furtherance of the objectives to be attained in educational lines. It may not be said

that defendant district, in allowing athletic competition with other schools, is thereby engaging in a function proprietary in nature. On the contrary, it is performing a governmental function vested in it by law.

Under facts somewhat analogous to those in the case at bar, and involving the precise question of immunity from liability claimed here, it was held in *Watson* v. *School District of the City of Bay City,* 324 Mich 1, by an evenly divided Court, that the plaintiff was not entitled to recover. Judgment entered by the trial court notwithstanding the verdict of the jury was affirmed. The reasons advanced in the prevailing opinion are applicable here. *Foss* v. *City of Lansing, supra,* is for the reasons hereinbefore suggested not applicable. It may be noted in passing that *Scott* v. *University of Michigan Athletic Ass'n,* 152 Mich 684 (17 LRA NS 234, 125 Am St Rep 423, 15 Ann Cas 515), was not an action against the board of regents of the University of Michigan but was, rather, against an association composed of undergraduates, alumni and businessmen. In the decision of the case, reversing judgment entered on a verdict directed for defendant by the court, it was emphasized that the association, rather than the board of regents, was a proper party to the action because it was responsible for the erection of the bleacher that collapsed and stood in a position analogous to that of proprietor of a public resort. It may be noted, also, that in *Robinson* v. *Washtenaw Circuit Judge,* 228 Mich 225, it was held that the board of regents was not liable for alleged malpractice on the part of a surgeon operating on plaintiff in the University hospital. It was held that said hospital was an adjunct to the medical department and was a State educational instrumentality maintained at public expense. We think the foregoing decisions clearly indicate the principles recognized in

this State as controlling on the question under consideration.

Counsel for plaintiff have called attention to the decision of the supreme court of Arizona in *Sawaya* v. *Tucson High School District No. 1 of Pima County,* 78 Ariz 389 (281 P2d 105). There the defendant school district rented its stadium for use by other schools in conducting a football game. It was the claim of plaintiff that while attending the game he fell because of the defective condition of the stadium. It was held that in leasing the stadium and receiving compensation therefor the school district was in the exercise of a proprietary function, and that in consequence it was liable for injuries sustained as a result of negligence in the maintenance of said stadium. It may be noted that the defendant district was not promoting an educational activity of its own but was, rather, receiving rental for the use of its property. The holding, being based on the finding that the function actually exercised was proprietary in nature, is not in point in the case at bar. It is interesting to note that in the opinion the court recognized the general rule, saying (p 391):

"We believe the great weight of authority to be that the school district is a quasi-public corporation and acts as a governmental agency for the sole purpose of furnishing educational facilities and administering the public educational system of the State and hence is not liable for the negligence of its officers, agents, or employees. We have so held in the case of *School District No. 48 of Maricopa County* v. *Rivera,* 30 Ariz 1 (243 P 609, 45 ALR 762). The case of *Bang* v. *Independent School District No. 27 of St. Louis County,* 177 Minn 454 (225 NW 449), cites cases from many jurisdictions adhering to this view."

Plaintiff also cites *Harllee* v. *City of Gulfport* (CCA), 120 F2d 41, in which it was held that under

pertinent provisions of the Mississippi code of 1930 the duty rested on defendant city to maintain jurisdiction over its public parks and playgrounds and to exercise reasonable care to make them safe for public resort. Plaintiff was injured because of defective equipment belonging to the city. Obviously, the decision must be regarded either as based on provisions of the State statute, construed as imposing duties on the city, or as in direct conflict with decisions of this Court, above cited. In either event, it may not be regarded as authority for holding the defendant school district liable in the case at bar.

Appellant further claims that the trial court was in error in excluding certain testimony offered by the plaintiff on the trial. We have examined the record and have concluded that no error prejudicial to plaintiff was committed in the respects to which attention is directed. Had the testimony offered been received, it does not appear that the result reached, so far as the granting of the motion for judgment notwithstanding the verdict is concerned, could have been in any way affected.

Judgment affirmed.

DETHMERS, C. J., and KELLY, J., concurred with CARR, J.

BLACK, J. (*concurring*). The special verdict considered in Mr. Justice CARR's opinion was returned in accordance with practice dictated by an old statute, the substance of which appeared first in 1885 (PA 1885, No 15) and is now recorded in CL 1948, § 618.39 (Stat Ann § 27.1019).* Assuming that the question or questions answered by the jury are determinative of a controlling issue of fact, the answer or answers (see opinion on rehearing, *Tyler* v.

---

* The special verdict procedure authorized by section 7 of Court Rule No 37 (1945) is not involved in this case.

*Wright,* 188 Mich 561, 567) become the governing verdict and, if they conflict with the jury's general verdict, the latter falls before the former by command of the statute. This is such a case.

Plaintiff alleged in his choke-bored declaration—aimed so to speak at the Atlas bleachers alone—that the defendant school district was negligent in setting up the Atlas bleachers without stable and solid footing; that such negligence was the proximate cause of his admittedly serious injuries, and that he was entitled to recover against the school district on such pleaded theory. No other triable issue was made and the parties plaintiff and defendant squared off before the jury to settle it.

The special question, answer to which formed the pivotal special verdict in this case, was submitted by the defendant school district. Plaintiff did not object to its form or fitness below. Neither did he request an amendment of his declaration to meet or fend the purposed thrust thereof. He does object here, with high temperature, but we cannot under such circumstances criticize minutely the disclosed purpose of the question and the effect of its answer (COOLEY, J., in *Dupont* v. *Starring,* 42 Mich 492, 495).

The special question pursued the school district's defense of fact; that the proximate cause of collapse of the Atlas bleachers was not as claimed by plaintiff—that it consisted of cadenced swaying of exuberant fans, seated on adjacent Leavitt bleachers, the ultimate result of which hurled the weight-laden Leavitt bleachers laterally into the Atlas bleachers.

The jury, by its answer to such question, upheld the mentioned defense of fact. The special verdict thus negatives the case made by plaintiff's declaration and the testimonial case made thereunder. *Thorsen* v. *Babcock,* 68 Mich 523, turning upon the same statute, dictates that judgment in such circumstances must follow the special and not the general

verdict. The trial judge was consequently right in entering judgment for the defendant school district.*

Having arrived at conclusion that the jury's special verdict calls for judgment as indicated, it becomes unnecessary to decide the question of immunity from liability as pleaded by the defendant school district.

I vote to affirm, with costs to defendant.

SHARPE, J., concurred with BLACK, J.

EDWARDS, J. (*dissenting*). History would tell us that the doctrine, "The king can do no wrong," died at Runnymede in 1215. Yet in the court which tried this case the legal ghost of that doctrine strode forth and struck down a jury award of damages to an Oakland county dentist seriously injured at a Thanksgiving Day football game by the collapse of

---

* This case was submitted during our last October term. Since then *Hormel Estate* v. *Harris*, 348 Mich 201, has been submitted and decided. In *Hormel* we unanimously ruled (p 205 of report) that a jury may not return a verdict for plaintiff on some different theory than that advanced by him, and that, if the jury's answer to a special question is inconsistent with and rejects plaintiff's theory, his case fails and a general verdict in his favor must yield to the inconsistent special finding. The rule of that case is controlling here, the statutory practice as invoked and applied in each case being mandatory.

The 2 cases (*Hormel* and Richards) pointedly renew bruited question whether there is any occasion for 2 variant rules of special question practice. They suggest again that consideration be given in our quarters to elimination of the statute with resultant confinement of the practice to that which may be done as a matter of discretion pursuant to present section 7 of Court Rule No 37 (1945). To require a jury to bring in general and special verdicts that might be contradictory is an arrant incongruity at best, and our reports disclose regular instances where the statutory practice has led to confusion and retrial rather than prompt and intelligent justice (For argument supporting employment of the Court Rule and discard of the statute, see Sunderland's notes, pages 67–70 of 1931 revision of Michigan Court Rules).

negligently-erected bleachers. Basing his opinion largely on an immunity derived from that once held by the absolute sovereign, Justice Carr would likewise hold that this school district cannot be sued for this wrong. And he holds this even though the tort was committed in the conduct of a revenue-producing activity and the injured person was an invited, admission paying, innocent spectator.

His opinion, if adopted, would, to some degree, extend the influence of a doctrine which has been whittled down in our courts and legislative halls in recent decades. We cannot concur with turning the clock back from such progress as has already been made toward allowing damages for governmental wrongs.

The real question which this case raises is: When in the discharge of a governmental duty the agents of some governmental unit commit an act which injures or damages an individual, which act would occasion recovery if committed by a private person or corporation, shall the damage fall entirely upon the unlucky victim, or shall it rather be borne by all citizens of the governmental unit concerned through judgment or tax-paid insurance premiums?

The land which gave this doctrine birth has long since abandoned it and adopted the latter of these alternatives. For generations in English courts, actions founded upon negligence have been allowed against municipalities and school districts. *Lyme Regis* v. *Henley* (1834), 2 Clark & F 331 (6 Eng Rep 1180, 1 Eng Rul Cas 601); *Shrimpton* v. *Hertfordshire County Council* (1911), 104 Law Times Rep 145 (2 NCCA 238); *Ching* v. *Surrey County Council*, [1910] 1 KB 736 (2 NCCA 229); *Morris* v. *Carnarvon County Council*, [1910] 1 KB 840 (2 NCCA 234); *Smith* v. *Martin and the Corporation of Kingston-Upon-Hull*, [1911] 2 KB 775 (2 NCCA 215).

Certain of the States of the United States have likewise followed this later English precedent by marked deviation from the rule of governmental immunity as it applies to municipalities and schools.

California, by statute, now allows tort actions generally. California Government Code (Deering's 1951), §§ 53050 *et seq.*, and 16040 *et seq.*; California Education Code (Deering's 1952), §§ 1007 and 1008. Rather more limited liability has also been established by statute in New York, Washington and Alabama, apparently without the disastrous results which some defenders of governmental immunity have predicted. Lloyd, Municipal Tort Liability in New York, 23 NYU Law Quarterly 278; Rosenfield, Governmental Immunity from Liability for Tort in School Accidents, 5 Legal Notes on Local Government, 358 (1939–1940).

One State, Tennessee, has undertaken judicial amelioration of the immunity doctrine to the limited extent of insurance coverage. *Marion County* v. *Cantrell*, 166 Tenn 358 (61 SW2d 477); *Rogers* v. *Butler*, 170 Tenn 125 (92 SW2d 414).

There is no doubt, however, that the majority of the courts in the 48 States of the United States adhere at present to the basic proposition that the State and its political subdivisions are immune from damage actions arising from tort claims in the absence of ameliorative legislation or proof of proprietary function. 38 Am Jur, Municipal Corporations, § 572, and 18 McQuillin, Law of Municipal Corporations (3d ed), § 53.05 and cases cited therein.

Some brave and persuasive voices have been raised from the bench to urge outright judicial abandonment of the ancient judge-made rule. Justice Wolfe put the case for these dissenters thus (*Bingham* v. *Board of Education of Ogden City*, 118 Utah 582, 593, 594, 598–600 [223 P2d 432]:

"I dissent.

"The court's opinion states:

" 'While law writers, editors and judges have criticized and disapproved the foregoing doctrine of governmental immunity as illogical and unjust, the weight of precedent of decided cases supports the general rule and we prefer not to disregard a principle so well established without statutory authority. We, therefore, adopt the rule of the majority and hold that school boards cannot be held liable for ordinary negligent acts.'

"I prefer to regard said principle for the purpose of overruling it. I would not wait for the dim distant future in never-never land when the legislature may act. During my 6 years on the district bench and 16 years on this bench, the principle of sovereign immunity and its cousin, nonliability of charitable institutions, specifically of hospitals, has come before this court at various times. We, as well as other courts of last resort, in various jurisdictions have had to face this problem of the principle of nonliability of the State and of municipal and quasi-municipal corporations which are said to have taken on the cloak of sovereignty because of their exercise of governmental functions which, it is claimed, insulates them from the doctrine of *respondeat superior*. We have recognized that the State, which permits an action for damages against its citizens for injuries inflicted by their torts and the torts of their servants committed in the course of or in pursuance of the master's business, should not shield itself behind the immoral and indefensible doctrine that 'the king (sovereign) can do no wrong;' that neither should the sovereign take refuge in the doctrine that its own agencies, the courts, must not be allowed to render judgment against their creator. \* \* \*

"Having in the case of hospitals found the rule of immunity not fitting for the conditions of today, we should by the same token hold the rule of sovereign immunity not applicable for the conditions of today. It is outmoded and does not fit those conditions.

"Society has developed systems whereby risks may be pooled and distributed. In consequence, I think the fear that I expressed in the *Niblock Case* [*Niblock* v. *Salt Lake City*], 100 Utah 573, 583 (111 P2d 800, 804) that 'the State should be free from the vexatious suits based on fictitious grounds which might spring into abundance were the immunity removed' did not take into account that the risk might be insured. Doubtless, there will be fictitious or unworthy suits and doubtless some of them will be successful. That is one of the penalties we pay for democracy and justice, because justice must be administered by human beings. But greatly outweighing this consideration is the fact that in a period of time children and adults injured by the negligence of servants of the State, or employees of the municipalities or of the school boards, will suffer the injustice of being uncompensated by a society which was too shortsighted to see that the rule of sovereign immunity was outmoded and no longer necessary.

"I admit that the legislature could and should abolish or modify the doctrine. But we must be realistic. It may be a long time indeed before the enlightened individuals in our society become sufficiently interested and aroused to the injustice of this rule of immunity as to bring that social pressure on the legislature which Mr. Justice Holmes denominated the 'felt necessity of the times.' But meanwhile children, not charged in fact or law with the capacity and experience to know danger, and adults not chargeable with contributory negligence, may perish or carry throughout their lives disfigurement and impairment without hope of compensation because they were unlucky enough to have had such damages inflicted by a servant of the State or by a servant of one of its governmental arms.

"Certainly we have a duty here. There are cases where we are powerless to act because the remedy lies solely with the legislature. But in those cases where we still have control of a rule or doctrine because it was judge made and developed, we may act.

Nonaction here and 'passing' the problem to the legislature is the easy way out. But I do not think it conscionable for us not to lift our hand when to do so would bring the law up to date and furnish remedies long overdue. I opine that if we affirmatively acted, there would be those who would hasten to the legislature to advocate such limitations and conditions that they thought would be needed to give the State and now exempt bodies opportunity to make timely investigation and to prevent excessive judgments against those public bodies."

See, also, Erickson dissent in *Rhoades* v. *School District No. 9, Roosevelt County,* 115 Mont 352, 361 (142 P2d 890, 160 ALR 1) and Frank dissent in *Clain* v. *City of Burlington,* 202 F2d 532.

As has been noted, this plea for outright abandonment of governmental immunity by judicial decision has to date been little heeded.

But in many other ways in this country, too, a trend is indicated toward mitigating and curtailing the harsh effects of this doctrine.

The Federal government, through congress, has in recent years in the tort claims act largely abolished the defense as far as tort claims against the United States government are concerned. 28 USCA, § 2674; 28 USCA, § 1346(b). See *Indian Towing Co.* v. *United States,* 350 US 61 (76 S Ct 122, 100 L ed 48); *Rayonier Incorporated* v. *United States,* 352 US 315 (77 S Ct 374, 1 L ed2d 354).

In the same spirit the Michigan legislature has abolished the defense of governmental immunity for all political subdivisions of the State as well as for the State itself in relation to negligence actions pertaining to motor vehicles. CL 1948, §§ 691.151, 691.-152 (Stat Ann 1952 Rev §§ 9.1708[1], 9.1708[2]; CL 1948, § 691.141 (Stat Ann 1955 Cum Supp. § 27.3548 [41]).

For a still longer period of time the courts of Michigan have moved to some lesser degree in the same direction by refusing to apply the doctrine of immunity in that classification of cases where the activity concerned was of a revenue-producing character and, hence, "proprietary" in nature. *Hodgins* v. *Bay City,* 156 Mich 687 (132 Am St Rep 546); *Foss* v. *City of Lansing,* 237 Mich 633 (52 ALR 185); *Matthews* v. *City of Detroit,* 291 Mich 161.

This distinction between "proprietary" function and "governmental" function has itself been widely criticized as difficult to interpret and lacking in logic. Antieau, Tort Liability of American Municipalities, 40 Ky Law Journal 131, Tooke, Extension of Municipal Liability in Torts, 19 Va Law Rev 97. In our view, the basic lack of logic, however, lies not in the "proprietary" exception, but in the underlying rule based upon the notion that the King can do no wrong when so much of history testifies to the contrary.

The clear-cut remedy to the problem of governmental immunity undoubtedly lies with State legislation of the nature and character of that adopted within recent years by the Federal government through congress. Court action to achieve the same goal by repudiation of this long-established common-law doctrine is hampered by unnumbered precedents and the doctrine of *stare decisis.* It cannot come as can legislative change after ample public discussion and with full warning to those bodies upon whom liability would be thrust to take such measures of an insurance nature as they might deem desirable.

Further, in the instant case, this major question has not been adequately briefed or argued. Nor, indeed, do we believe a decision on the basic doctrine essential to our current decision except in the sense that this case will inevitably either extend or curtail governmental immunity to some degree.

To that degree we do not hesitate to continue in this case the established judicial movement toward curtailing this rule of protected negligence. For the present, we reiterate the existing distinction in Michigan between functions which are solely governmental and those which are also proprietary in their nature.

Much of the confusion that has come into its discussion lies in the assumption that these are mutually exclusive terms. This, we believe, is not so. All activities performed by any governmental unit within constitutionally or legislatively-assigned powers are obviously governmental. Of those governmental functions some are recognized in this distinction as being more customarily performed by private industry, less historically associated with government alone, and these, when they produce revenue or profit, have been termed "proprietary." There is no necessity, in order to find an activity "proprietary" for. the purpose of exemption from governmental immunity, also to find that it is nongovernmental.

Thus we agree with Justice CARR that the football game which produced this current litigation was a proper governmental activity for the school district of the city of Birmingham to sponsor. Nor do we hesitate to say that when the school district of Birmingham charged admission thereto, solicited and advertised for attendance, set up temporary bleachers to accommodate larger numbers of admission-paying spectators, and collected a sum total of $5,757.55 in admissions, that it was thereby engaging in a "proprietary" function which, under the case law of this State, forestalled any claim of immunity.

It is interesting to note that from the gross admission sum recited above, the official report of expenses includes payment of $956.21 Federal tax. This follows the decision of the United States supreme court in *Allen* v. *Regents of University System*

*of Georgia,* 304 US 439 (58 S Ct 980, 82 L ed 1448),.
wherein the supreme court held that State college
athletic contests for which admission was charged
were subject to a Federal admission tax. Mr. Justice
Roberts' opinion, in speaking of the University of
Georgia's athletic contests, said (p 452): "The
important fact is that the State, in order to raise
funds for public purposes, has embarked in a busi-
ness having the incidents of similar enterprises.
usually prosecuted for private gain."

We can find no more apt definition of a proprietary
function than the above. And the fact situation
which gave rise to Justice Roberts' comment is iden-
tical in all matters bearing on legal principles with
the one with which we deal here.

We recognize that, in the event this opinion pre-
vails, we are for the first time, in Michigan, specific-
ally applying the "proprietary" limitation upon
governmental immunity for school districts. Yet
the "proprietary" limitation has been recognized
frequently in Michigan as applicable under proper
facts to school districts as well as to municipalities.
*Daniels* v. *Board of Education of the City of Grand
Rapids,* 191 Mich 339 (LRA 1916F, 468) ; *Daszkiewicz*
v. *Detroit Board of Education,* 301 Mich 212.

In both of these above-cited cases the decision in
favor of immunity for the school district was based
on the fact that the school's alleged negligent act
arose from nonproprietary functions involving main-
tenance of the actual school building.

In *Watson* v. *School District of the City of Bay
City,* 324 Mich 1, the Court divided evenly 4–4 with
the result of upholding the trial judge who there (as
here) granted defendant's motion for verdict *non
obstante veredicto.* The 2 opinions agreed, how-
ever (p 9), on the essential legal question posed here :.

"Plaintiff properly contends that the answer is determined by the test of whether the function involved is a governmental function or a proprietary function."

Our question in this case, then, is simply: Was the defendant school district engaged, on the date in question, in a "proprietary" function within the meaning of this doctrine? The answer lies in the facts which much more strongly favor an affirmative answer than even those in the *Watson Case* which evenly divided the Court:

(1) The game was on a school and national holiday—Thanksgiving, 1948;

(2) The general public was invited by paid advertisements;

(3) The plaintiff, as well as all spectators, paid admission;

(4) The total admissions greatly exceeded the costs of the game, leaving a profit after taxes and expenses of over $3,000;

(5) The accident occurred in the stands provided for the admission-paying spectators and while the players were on the field;

(6) The particular source of the injury (the temporary stands) was erected specifically for the game in question, and obviously for the purpose of producing more revenue. The source of injury was not (as in the *Watson Case*) a permanent feature of the regular school premises;

(7) As to one set of stands, the school district deliberately sought to reduce the cost and increase the profit by attempting to contract its claimed immunity to the suppliers of the stands, through an agreement "to assume all responsibility that might be incurred during the use and rental of these seats."

In our view, these facts clearly indicate that the defendant school district was engaged in a "proprie-

tary function" in the conduct of this football game and, hence, under present and settled Michigan case law is not entitled to claim the defense of governmental immunity.

As another basis for denial of relief, my Brothers CARR and BLACK point to the answer to a special question and say that the jury's answer thereon was inconsistent with its general verdict.

The statute (CL 1948, § 618.39 [Stat Ann § 27.-1019]), under which special questions may be submitted, is as follows:

"In all cases where an issue of facts is tried before any court of record, the court shall at the request in writing, of the counsel of either party, instruct the jury if they return a general verdict, also to find upon particular questions of facts, respecting which the issue is joined, to be stated in writing, and shall direct a written finding thereon: Provided, such special questions shall not exceed 5 in number, and shall be each in single, short sentences, readily answered by yes or no. The special verdict, or finding, shall be filed with the clerk, and entered upon the minutes, and when any special finding of facts shall be inconsistent with a general verdict, the former shall control the latter, and the court give judgment accordingly."

It will be noted that its language provides such special questions shall not exceed 5 in number, and shall be each in single, short sentences, readily answered by "yes" or "no"; and, further, "when any special finding of facts shall be inconsistent with a general verdict, the former shall control the latter."

Our special question was as follows:

"Do you find that the proximate cause of the fall of the bleacher section in which Dr. Richards, the plaintiff, was sitting was a sideward thrust or lateral force applied thereto by a sideward movement of the adjoining bleacher sections, which sideward

thrust or lateral force resulted from the sideward movement of one or more Leavitt bleacher sections at the north end of the east side of the football field?"

It may be doubted whether this wording complied with the purpose or the letter of the statute, but no objection having been made to the question below, we will not decide this issue here.

Was the affirmative answer given by the jury to the stated question inconsistent with an award of damages to plaintiff? To hold that it was requires a curious logic. Plaintiff filed his lawsuit, reciting as facts that when as an invited, paying spectator he was sitting in stands erected by defendant, they collapsed under him, due, in his assertion, to negligent erection thereof by defendant school district. Now, having been found guilty of such negligence by the general verdict of the jury, the school district seeks to avoid liability on the ground that the jury found during the course of the trial that the actual negligence which occasioned the collapse of the stands on which this spectator was sitting pertained to some other stands also erected by the same defendant and immediately abutting the stands the spectator was on. These other stands, presumably, were erected with such negligence as to fall first, and, hence, by "lateral thrust," occasioned the collapse of the perhaps less negligently-erected stands upon which the plaintiff was seated.

In our view, it would be the gravest injustice to the plaintiff to deny him recovery in this fashion when defendant's defense becomes, not that it was not negligent, not that its negligence did not proximately cause plaintiff's injury, but that defendant's negligence of a slightly different character than that which plaintiff had urged upon the court (and about which distinction only the defendant could have had knowledge) occasioned his injury.

The record before us discloses that plaintiff sought information in 1949 as to the supplier of the stands which resulted in his injury. Plaintiff's exhibit #27 is a letter from the Birmingham Public Schools, signed by Superintendent Dwight B. Ireland and addressed to plaintiff's attorney, reciting in part:

"From your description I have again discussed this matter with the athletic director, and he assures me that Dr. Richards was sitting on bleachers which were rented from the Atlas Portable Bleacher Company, 2170 East Jefferson avenue, Detroit. The 2 sections of bleachers next to the reserved seats were from the Atlas Portable Bleacher Company, and there is no question but that Dr. Richards was sitting on these bleachers from the location of his seat as described in your letter."

It developed during the trial some years later that other sections of the temporary bleachers on the same side of the field as the Atlas bleachers had been rented by the school district from the Walled Lake schools. These are referred to as the Leavitt bleachers. There was testimony from which the jury apparently found that it was these bleachers which collapsed first and by a pressure to the side occasioned the collapse of the adjacent Atlas bleacher upon which Dr. Richards was sitting.

Plaintiff sued the school district and the Atlas Bleacher Company, the only supplier of temporary stands whose name had been furnished him by the school district.

But plaintiff pleaded negligence in relation to defendant school district's erection of *all* the temporary stands:

"That notwithstanding the aforesaid duties, said defendants jointly and severally, did on or about Thanksgiving Day, November 25, 1948, in the city of Birmingham, invite the public generally to attend a

football game and provided temporary bleachers for seating accommodations to those patrons that paid the admission price and which thereby entitled the buyer of said ticket to occupy a seat provided for by said defendants; that said bleachers were inadequately, improperly, negligently and carelessly constructed and maintained by said defendants, in that, to-wit: no boards or planks were placed under the supporting uprights to prevent the stands from sinking in the ground and thereby imperiling the stability of the bleachers; that no footboards were used connecting the supporting uprights to the stand structure to prevent the bleachers from shifting; that the assembled parts of the bleachers were not secured together by proper bucks, braces and bolts to insure a solid structure; that the bleachers were not adapted to the purpose for which they were used; that proper inspection was not made for the use of the bleachers at the time the general public was invited to occupy them; and there was failure to properly maintain said bleachers to insure the safety of invited patrons occupying them; that by the failure of the defendants to fulfill their aforesaid legal duties, they erected and maintained a structure which was inherently dangerous and jeopardized the life and limb of a crowd of people invited to use them upon payment of an admission fee."

Defendant school district denied negligence generally in its answer, but did not plead any affirmative defense pertaining to the prior collapse of the Leavitt stands.

Plaintiff offered testimony at trial from which the jury might properly have found that both the Atlas temporary bleachers and the Leavitt temporary bleachers had been erected by defendant school district with negligence which was the proximate cause of Dr. Richard's injury.

Subsequent to the jury verdict for plaintiff the trial judge granted defendant's motion for judgment notwithstanding the verdict of the jury.

We recite the evidence from a point of view favorable to the plaintiff, when we deal with motions for directed verdicts or judgment *non obstante veredicto*. *Canning* v. *Cunningham*, 322 Mich 182; *Miller* v. *Pillow*, 337 Mich 262.

Plaintiff's witness, Walter Kidle, who had had experience with the erection of bleachers, testified as follows:

"As I walked up there, as near as I could to the back of the bleachers, and up to the north end, I could look under the bleachers themselves. I noticed there wasn't any planks. I saw that with my own eyes. I know what an A-jack is. They are the things that hold up the stringers upon which the seat boards and foot boards are placed. As I walked, I noticed that the legs of the A-frames were sinking into the ground. The game had not commenced then yet. I stayed on the east side of the field and I walked to the north end of the stand. We walked around the stand, the end of the stand, and then progressed along the front of the stand to find a seat. We found a place to sit on the bleachers. The bleacher we sat on collapsed. I do not know whether it was the same bleacher that Dr. Richards sat on."

Mr. George Westerby, a witness for the defendant school district, called for cross-examination by plaintiff, testified that, when he had erected the stands under the instructions of Mrs. Stringham, one of the owners of the Atlas Bleacher Company, in a previous year, he had shimmed the A-frames where the ground was low and "I always used boards where the ground was soft." His testimony continued pertaining to inspection of the bleachers after this accident: "I saw no planks under any of the A-frames. I did not see any of those so-called 4-foot lengths of

boards under any of the A-frames. Not at that time, at that particular end, nor on any other end."

Other witnesses indicated that there was considerable variance in the level of the area in which the temporary bleachers were erected, and that the ground was soft and muddy and that no shims or planks were used underneath the A-frames of either the Atlas or Leavitt bleachers.

From the entire testimony a fair inference could have been drawn by this jury that the legs of the A-frames set on uneven and muddy ground without planks underneath them, sank into the mud under the load of spectators seated and standing on the bleachers, and thus unbalanced the distribution of weight on the A-frames so as to occasion the collapse of the bleachers.

Thus plaintiff produced evidence at the trial from which the jury could have found defendant school district negligent in the erection of both the Atlas and Leavitt bleachers, as the jury did by its general verdict.

The writer cannot read the answer to the special question as inconsistent with the general verdict. By the general verdict the jury found the school district guilty of negligence which was a proximate cause of plaintiff's injuries. By the answer to the special question, the jury indicated that the Leavitt bleachers collapsed first, and that the Atlas bleachers toppled as a result of the thrust from the falling Leavitt bleachers. Defendant had erected both sets of bleachers, and there is no proof in the record of any other cause of collapse than defendant school district's negligence in erection. Certainly the swaying of the football game crowd must be regarded, from this testimony, as a usual and anticipated feature of the employment of the stands.

We have frequently held the driver of car A for his proximate negligence in injuring party C when

the facts clearly showed that A hit B and that B alone hit C. *Greenwold* v. *Faber,* 234 Mich 217; *Parks* v. *Starks,* 342 Mich 443.

Defendant refers to a domino-like action in the collapse of the stand and contends that plaintiff was seated on one of the last dominos. We find no difficulty in holding the party whose tortious act occasioned the fall of the first domino, for the injury to an innocent party hurt by the fall of the last. The act which started a chain reaction can indeed be "the proximate cause" of subsequent injury, provided negligence was such that reasonable people in contemplating it might anticipate the sort of subsequent injury which actually did occur.

It is certainly within reasonable contemplation that the collapse of improperly-erected, heavily-loaded bleachers might occasion by "lateral thrust" the similer collapse of similarly loaded, similarly improperly-erected stands immediately abutting.

We therefore hold that defendant school district of the city of Birmingham was on the date in question engaging in a "proprietary function" in the sponsoring of an athletic contest for which admission was charged, and, hence, cannot escape liability for negligent acts performed in relation to said contest on ground of governmental immunity. We hold further that the answer to special question #2 was not inconsistent with the general verdict of the jury, and that the trial judge was in error in granting defendant's motion for judgment *non obstante.*

The judgment of the trial court should be reversed and the cause remanded for the entry of judgment upon verdict of the jury. Costs to appellant.

SMITH, J., concurred with EDWARDS, J.

VOELKER, J., took no part in the decision of this case.