Mickey LAMBERT, Plaintiff-Appellant,

v.

**UNITED STATES of America,**
**Defendant-Appellee.**

No. 19914.

United States Court of Appeals,
Sixth Circuit.

Feb. 12, 1971.

McAllister, Senior Circuit Judge, dissented and filed opinion.

————◆————

Hal Gerber, Memphis, Tenn., for plaintiff-appellant; Gerber, Gerber, Lewis & Marshall, Memphis, Tenn., of counsel.

William D. Appler, Dept. of Justice, Washington, D. C., for defendant-appellee; William D. Ruckelshaus, Asst. Atty. Gen., Alan S. Rosenthal; Stephen R. Felson, Attys., Dept. of Justice, Washington, D. C., Thomas F. Turley, Jr., U. S. Atty., Memphis, Tenn., on the brief.

Before WEICK and CELEBREZZE, Circuit Judges, and McALLISTER, Senior Circuit Judge.

WEICK, Circuit Judge.

Lambert instituted this action in the District Court against the Government, under the provisions of the Federal Tort Claims Act, to recover damages for personal injuries sustained by him while unloading cargo from a trailer which belonged to his employer, Time Freight, Inc., at its terminal in Memphis, Tennessee. In his complaint Lambert charged

that Government employees had negligently loaded the trailer at the Government Defense Depot in said city, and that as a result thereof he was injured later while unloading the trailer at the carrier's terminal.

The case was tried by the District Judge sitting without a jury. The District Judge adopted findings of fact and conclusions of law, and rendered judgment in favor of the Government, dismissing the complaint. Lambert appealed. We affirm, but on grounds different than those relied upon by the District Judge.

The trailer was loaded at the Defense Depot by a truck driver named Anson Long, who was a fellow employee of Lambert. Long was assisted by an unnamed Government employee in the loading of heavy items. The cargo was less than a truckload and consisted of cartons of steel sheets, angle irons and rods. Some of the cartons of steel sheets were loaded on top of the angle irons and rods. When the loading was completed, the trailer, attached to a tractor, was driven by the truck driver to the terminal of the carrier, a distance of five or six miles, where Lambert alone proceeded to unload it in order that it could be made part of a full truckload and shipped elsewhere. In unloading the cargo, one or more of the steel sheets fell against a side-wheeler which Lambert was using, pinning him against the side of the trailer.

The evidence was in conflict as to whether the cargo had been properly loaded at the Defense Depot. The District Judge found, however, that the steel sheets had been loaded in a dangerous manner, and that the truck driver, Anson Long, and the Government employee who assisted in the loading, were both negligent. The Court held that the primary responsibility for loading the trailer was upon the carrier, relying on United States v. Savage Truck Line, 209 F.2d 442 (4th Cir. 1953), cert. denied 347 U.S. 952, 74 S.Ct. 677, 98 L.Ed. 1098 (1954).

The Court found that the negligence of the truck driver, Anson Long, was the proximate cause of Lambert's injury, and that the negligence of the unnamed Government employee was not a substantial factor in producing the injury. The Court further found that Lambert was not contributorily negligent but that he assumed the risk of the injury which he sustained. The Court concluded as a matter of law that the defense of assumption of risk was unavailable to the Government because it was not pleaded in its answer. The finding of the Court with respect to assumption of risk and contributory negligence is as follows:

"The Court further finds, although it was not pleaded and the Court does not believe it can be a basis for the outcome of the suit, however, the Court will make the finding that Mr. Lambert assumed the risk of his injury. This is established by the fact that he had been a driver before his injury and he testified he knew this method was dangerous, that he would not get near it when it was going on. He was fully aware of this improper method of loading. And if he knew it when he was a driver, that knowledge certainly would be binding on him when he was a checker at some subsequent time. The Court does not find that he was guilty of contributory negligence in that his conduct in unloading was never shown to have been in the absence of reasonable and ordinary care under the circumstances. The assumption of risk and contributory negligence are separate doctrines; and the Government did not plead assumption of risk and, therefore, the Court believes it is not available to them."

 The Court was in error in holding that the defense of assumption of risk was unavailable because it was not pleaded. Rule 15(b) of the Federal Rules of Civil Procedure provides:

" * * * [W]hen issues * * * are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings."

Lones v. Detroit T. & I. R. R., 398 F.2d 914 (6th Cir. 1968), (involving unpleaded

issue of willful and wanton misconduct); Hasselbring v. Speelman, 246 F.2d 34 (6th Cir. 1957), (involving sudden emergency).

There was substantial evidence to support the Court's finding that Lambert assumed the risk, and also tending to prove that he was contributorily negligent.

Lambert admitted that there was lighting on the dock and floodlights to shine inside the trailer, and that the lighting was sufficient. He could therefore see and observe the manner in which the cargo had been loaded, had he looked.

Lambert testified on cross-examination as to his knowledge of the dangerous loading of the trailer as follows:

"Q. Have you ever loaded anything like—you have seen this picture, of course, Mr. Lambert; did you ever load anything like that?

A. Yes, sir.

Q. How did you load it?

A. Are you speaking of at the Depot or at my terminal?

Q. At the Depot.

A. At the Depot if it was heavy freight—ordinarily I have seen this come five or six and maybe eight on a stack and it has been brought into my trailer on a forklift; and the forklift operator goes back and gets on one side and lifts it up against the wall.

Q. And you didn't touch it?

A. No, sir, I didn't go around it.

Q. What would you do, go get a cup of coffee?

A. I wouldn't touch it because it could fall."

Although by his own admission Lambert would not "touch" a cargo loaded as this one was, "because it could fall," the fact is that he did touch it and was unloading it alone. It did fall and injure him.

The truck driver, who was a witness for Lambert, testified that he loaded the trailer and that he was assisted in the loading of items which were too heavy for him to handle alone by a Government employee whom he did not name. Since the primary responsibility for the loading was upon Lambert's employer, the sole reason for calling upon Government employees for assistance was to help in the loading of heavy items. Yet Lambert at the carrier's terminal undertook to and did unload these heavy items alone. The evidence clearly supported the District Judge's finding as to assumption of risk.

It should also be noted that although both Long and Lambert testified as to the practice of Government employees to load cartons of steel sheets by driving a forklift inside the trailer, the District Judge found as a fact that the forklift was too large to be operated inside the trailer and that the forklift was used only to carry the cartons of steel to the trailer where they were placed on one or more pallets, pushed inside the trailer and piled against the side of the trailer by hand.

In Restatement of the Law, Torts 2d, § 496A, page 560, it is stated:

"A plaintiff who voluntarily assumes a risk of harm arising from the negligent or reckless conduct of the defendant cannot recover for such harm."

In Restatement of the Law, Torts 2d, § 496C(1), pages 569, 570, it is stated:

"Except as stated in Subsection (2), a plaintiff who fully understands a risk of harm to himself or his things caused by the defendant's conduct or by the condition of the defendant's land or chattels, and who nevertheless voluntarily chooses to enter or remain, or to permit his things to enter or remain within the area of that risk, under circumstances that manifest his willingness to accept it, is not entitled to recover for harm within that risk."

Contributory negligence and assumption of risk sometimes overlap. This is recognized by comment c. 4 in Restatement of the Law, Torts 2d § 496A, page 562, where it is stated:

"4. To be distinguished from these three situations is the fourth, in

which the plaintiff's conduct in voluntarily encountering a known risk is itself unreasonable, and amounts to contributory negligence. There is thus negligence on the part of both plaintiff and defendant; and the plaintiff is barred from recovery, not only by his implied consent to accept the risk, but also by the policy of the law which refuses to allow him to impose upon the defendant a loss for which his own negligence was in part responsible."

In our opinion the finding of the District Judge that Lambert was not contributorily negligent is clearly erroneous.

■ Two additional matters should be mentioned. The carrier did accept the shipment and assumed control over it. Its employee, Long, had knowledge that the trailer had been dangerously loaded, he himself having loaded it, with the assistance of a Government employee. His knowledge is imputed to the carrier. In that dangerous condition, the carrier transported the cargo from the Defense Depot to its terminal five or six miles distant therefrom. Whether something happened to the cargo in that movement which might have caused or contributed to Lambert's injury, does not appear from the evidence. There was no showing that when Lambert commenced to unload the cargo it was in the same condition as when it was loaded.

In any event, since the carrier accepted the shipment for delivery with full knowledge that it had been dangerously loaded, it could and should have eliminated the hazard, and its failure to do so has been held to constitute an intervening agency absolving the shipper from liability for injuries to third persons. Hurt v. Charles J. Rogers Transp. Co., 164 Ohio St. 323, 130 N.E.2d 824 (1955).

In Jaffke v. Dunham, 352 U.S. 280, 77 S.Ct. 307, 1 L.Ed.2d 314 (1957), the Court held:

"A successful party in the District Court may sustain its judgment on any ground that finds support in the record." (p. 281, 77 S.Ct. at p. 308)

The judgment of the District Court is affirmed.

CELEBREZZE, Circuit Judge, concurs.

McALLISTER, Senior Circuit Judge (dissenting).

My principal ground of dissent is that the majority opinion holds that appellant "assumed the risk" of employment, thus discharging appellee from all liability for injuries suffered from appellee's negligence, although appellant was not the employee of appellee, and the law has always seemed clear to me that a party cannot rely on the defense of assumption of risk unless the injured party is an employee of the party asserting the defense of assumption of risk.

Mickey Lambert brought an action for personal injuries against the United States and appeals from a judgment denying him recovery. He is an employee of Time Freight, Inc., a motor carrier of freight.

The United States Government, in Memphis, Tennessee, maintains a large Defense Depot consisting of a warehouse and distribution center. The warehouse is used to store heavy slabs or sheets of steel, each sheet weighing from one hundred pounds to a ton, as well as angle irons and iron rods, eight to ten inches in diameter and approximately eight feet long. The Government also employs many men at the Defense Depot to load the heavy steel sheets and the iron onto trucks and trailers. These private freight carriers transport the steel from the government Defense Depot to private freight docks where it is unloaded by employees of the motor carrier for transshipment by railroad to other government depots and military installations throughout the country.

At the government Defense Depot in Memphis, the driver of an independent truck and trailer often helps to load the trailer with the smaller sheets of government steel, but if a sheet weighs

more than a couple hundred pounds, a government employee of the Defense Depot would have to load it. Such government employees are expert at loading. For loading the heavier steel onto the trailers, the government employees have "side wheelers" and "forklifts." Loading the steel slabs and iron onto the trailers is about all that such government employees do. Probably everyone has seen such machines being operated. But how they are operated under various conditions is a skill that is special. To be an operator of a forklift, an employee has to undergo a course of instruction, and is not authorized to operate a forklift without being licensed to do so.

On March 25, 1966, Anson Long, who was an employee of Time Freight, Inc.,—the same company of which appellant Lambert was also an employee— drove a Time Freight tractor and trailer to the government Defense Depot at Memphis to secure a shipment of steel which was to be transported to the Time Freight loading dock, and thereafter reshipped from there. Mr. Long testified that he let the employees of the Defense Depot load the steel on top of the angle irons in the trailer, and that it was "dangerous the way it was loaded * * *" but "it couldn't be helped," because there was no other way to load angle irons and sheets of steel in the truck. Long drove the trailer to Time Freight, Inc., and then left it to be unloaded by some other employees, in accordance with the usual practice. That other employee was appellant Mickey Lambert, who arrived on the dock at the early hour of 2 A.M., March 26, 1966, which was the usual hour of his commencement of work there. He received $3.31 an hour for a forty-hour week, which amounted to $529.60 for twenty-eight days. He was an experienced employee, having been in the trucking business for eight to ten years. He unloaded trailers when they came on the dock, and reloaded them when they went out, using a "two wheeler, a side wheeler * * * forklifts and rollers * * * similar to a dolly." He started to unload the trailer in question from the

Memphis Defense Depot just before daylight. When steel shipments came in, they were usually stacked leaning against the inside wall of the trailer. The steel sheets were wrapped in cardboard, and a side wheeler was ordinarily used for this type of freight. When appellant Lambert unloaded freight of this kind before, it was usually stacked against the wall of the trailer, or lying flat. When he looked into the trailer, there appeared to be nothing unusual about the way the steel was stacked, and there was no indication that anything might happen if he began to unload it. Appellant Lambert took the side wheeler in to get, first, a lighter outside sheet of steel. He caught it at the top and pulled it over toward the side wheeler. When he did, the larger sheets, approximately three thousand pounds in weight, fell over on his side wheeler and pushed him against the wall. He fell down against the side wheeler. Each sheet weighed from two hundred to eight hundred pounds. Appellant called for help and five or six employees at the Time loading dock rushed over and lifted the heavy sheets of steel off appellant. The weight of steel falling upon appellant resulted in a compound fracture of his left leg just above the ankle, and the bone protruded through the skin. His right ankle was also broken.

I. The District Court found that appellant Mickey Lambert had assumed the risk of his injury, but that the defense of assumption of risk was unavailable to the Government because it was not pleaded. In the accompanying opinion it is held that the District Court was in error in holding that the defense of assumption of risk was unavailable because not pleaded, *and further held* that there was substantial evidence to support the finding that the appellant Lambert had assumed the risk, and sustained such defense, exonerating the Government from all liability.

We are of the view that the holding that appellant Mickey Lambert had assumed the risk of his injury, and is thereby precluded from maintaining his

action to secure damages is contrary to law. Likewise the negligence of the fellow servant, Anson Long, in this case, cannot be imputed to appellant.

II. The District Court found that although the employees of the Government were guilty of negligence in loading the steel on the trailer in a dangerous way, their negligence was not the proximate cause of appellant's injuries, since the primary duty of supervising the loading was that of Time Freight, acting through its employee, Anson Long, and that therefore the proximate cause of the accident was the negligence of Long in not properly supervising the loading.

We are of the view that the District Court was in error in holding that the negligence of the government employees was not the proximate cause of the accident.

III. The District Court found that, based on all the facts of the case, appellant Mickey Lambert was not guilty of contributory negligence. The accompanying opinion reverses the District Court on this question of fact, and holds that the evidence conclusively shows that appellant Lambert was guilty of contributory negligence.

We are of the opinion that the District Court's finding that Lambert was not guilty of contributory negligence was sustained by the evidence, and that the accompanying opinion to the contrary is erroneous.

IV. The holding of the accompanying opinion that, in any event, regardless of the fact that there may have been no assumption of risk, no contributory negligence on the part of appellant, no liability of appellant under the "fellow servant rule," and that the Government had been guilty of negligence in having its employees load the steel on the trailer in such a way that it would topple onto appellant, nevertheless, because Anson Long knew that the trailer had been dangerously loaded by the government employees and himself, he could have eliminated the hazard, and his driving the dangerously-loaded trailer to the loading dock of Time Freight, Inc., was an acceptance of the shipment by that company, and such acceptance constituted an intervening agency, absolving the Government from all liability for the resultant injuries to appellant Lambert. The holding mentioned in this paragraph of an intervening agency, was never pleaded by the Government never mentioned in its arguments or briefs on appeal to this Court, and the argument supporting it appears for the first time in this case in the accompanying opinion. We, then, proceed to discuss the above questions seriatim.

We are of the view that it is error to hold that appellant Lambert is precluded from recovery of damages for his injuries because of the doctrine of "assumption of risk."[1] Lambert was not an

---

1. In view of our determination that "assumption of risk" is not a defense in this case, we feel, nevertheless, that it may be of interest to note the origin of the doctrine of "assumption of risk," the fact that federal and state statutes have obliterated it in many instances, and the low esteem in which it is held by legal scholars, who call for its eradication by legislative action where it still exists.

"The doctrine of assumption of risk by a servant or an employee finds its source in the English case of Priestley v. Fowler, decided in 1837, and in several American decisions of about the same period, although not until several decades had elapsed did it come into prominence. By 1870, however, the courts of many states adopted the doc-

trine; and in the ensuing decade it was recognized by all except a very few courts. Indeed, it seems that only one court has consistently refused to accept 'assumption of risk' as an independent principle of the law.

"The period during which the doctrine came into existence was one that favored capital in every way, and it was generally thought to be politic to deny the laborer a right of recovery against the capitalist when his only contention was that he had been injured in the discharge of his duties. In this connection it has been said: 'Employers have a right to decide how their work shall be performed, and may employ men to work with dangerous implements and in unsafe places, without incurring

employee of defendant Government and there was no contractual arrangement of any kind between them.

Assumption of risk was defined by Judge William Howard Taft in the first Court of Appeals constituted for this Circuit, when, in the case of Narramore v. Cleveland C., C. & St. L. Ry. Co., 96 F. 298, 301, 48 L.R.A. 68, speaking for the Court, he declared:

"Assumption of risk *is a term of the contract of employment*, express or implied from the circumstances of employment, by which the servant agrees that dangers of injury obviously incident to the discharge of the servant's

liability for injuries sustained by workmen who knew, or ought to have known, the hazards of the service which they have chosen to enter.' So, the assertion that the employee 'assumes the risk,' as has been thoughtfully observed, is merely another form of saying that in view of the circumstances, the law imposes the hazard upon him, and may be taken to mean that the employer has not been guilty of negligence on his part.

"Social and economic notions have changed since the time of Priestly v. Fowler; and apart from statutory enactment, the reports contain decisions which suggest that the courts may hold that no defense is available to the employer where it is shown that the employee was injured while performing his duties in the usual and contemplated manner." 35 Am.Jur., Master and Servant, Section 294.

"The doctrine of assumption of risk, however it is analyzed and defined, is in most of its aspects a defendant's doctrine which restricts liability and so cuts down the compensation of accident victims. It is a heritage of the extreme individualism of the early industrial revolution. But quite aside from any questions of policy or of substance, the concept of assuming the risk is purely duplicative of other more widely understood concepts, such as scope of duty or contributory negligence. The 1 exception is to be found, perhaps, in those cases where there is an actual agreement. Moreover, the expression has come to stand for 2 or 3 distinct notions which are not at all the same, though they often overlap in the sense that they are applicable to the same situation.

duty shall be at the servant's risk." (Emphasis supplied.)

The Supreme Court of Michigan, in Felgner v. Anderson, 375 Mich. 23, 40, 44, 133 N.W.2d 136, in deciding a case on the authority of Judge Taft's definition of assumption of risk, above set forth, also quoted from its prior decisions in Parker v. Grand Trunk W. R. Co., 261 Mich. 293, 296, 246 N.W. 125, 126 (Jan. 1933), and Otto v. Hansen Lumber Corp., 331 Mich. 37, 40, 49 N.W.2d 49, 51 (Sept. 1951).

In the *Parker* case, the court said:

"Assumption of risk is a doctrine based upon implied contract or waiver.

"Except for express assumption of risk, therefore, the term and the concept should be abolished. It adds nothing to modern law except confusion. For the most part the policy of individualism it represents is outmoded in accident law; where it is not, that policy can find full scope and far better expression in other language. There is only one thing that can be said for assumption of risk. In the confusion it introduces, it sometimes—ironically and quite capriciously—leads to a relaxation of an overstrict rule in some other field. The aura of disfavor that has come to surround it may occasionally turn out to be the kiss of death to some other bad rule with which it has become associated. We have seen how this may happen with the burden of pleading and proving an exceptional limitation on the scope of defendant's duty. There may be other instances. But at best this sort of thing is a poor excuse indeed for continuing the confusion of an unfortunate form of words." James, Assumption of Risk, 61 Yale L.J. 141, 168, 169 (1952).

"There is no doubt of the power of the state to change or abolish the common-law doctrine of assumption of risk, and the doctrine is now superseded either by general statutes or by enactments such as safety appliance acts, employers' liability acts, or workmen's compensation acts." 53 Am.Jur. 2d, Master and Servant, Section 267.

A review of the cases cited in Michie's Digest of Tennessee Reports on the doctrine of "assumption of risk" shows that it is limited to the employer-employee relationship. See Master and Servant, 11 Michie's Digest of Tennessee Reports, Section 46 et seq.

4 Elliott on Railroads (3d Ed.) § 1850. The doctrine requires the relation of master and servant, or contract for services, and relates to risks in the course of such an employment. As said in Bradburn v. Wabash R. Co., 134 Mich. 575, 579 [96 N.W. 929]:

"'The principle of assumed risk rests upon the ground that it is an implied contract between the employer and the employee that the employee shall assume the risk of all dangers obviously incident to his employment.'

"Plaintiff was not an employee of defendant, therefore the doctrine of assumption of risk has no applicability."

In the *Otto* case the court said:

"The question of whether plaintiff was furnished a safe place to work is not involved in the instant case. Nor is the defense of assumed risk. This is true since the relation of employer and employee or master and servant, to which these phases of the law are pertinent, did not exist and were not alleged in the instant case. See Bauer v. American Car & Foundry Co., 132 Mich. 537 [94 N.W. 9]; Swick v. Aetna Portland Cement Co., 147 Mich. 454 [111 N.W. 110]; Kaukola v. Oliver Iron Mining Co., 159 Mich. 689 [124 N.W. 591]; Parker v. Grand Trunk Railway Co., 261 Mich. 293 [246 N.W. 125]."

In Felgner v. Anderson, *supra,* the Michigan Supreme Court referred to the cases in which assumption of risk had been used in circumstances involving other than the employment relationship, as a "misuse of the doctrine" in the above cited cases, as well as in the earliest decided case in Michigan, Michigan Central Railroad Co. v. Leahey, 10 Mich. 193 (Apr. 1862), and referred to Mr. Justice Christiancy's statement therein as follows:

"Where one man enters into the service of another to perform a particular kind of work, he is very properly held, as between himself and his employer, to assume the natural and ordinary risks incident to such service, arising from the negligence or misconduct of his fellow-servants, as well as other risks not arising from the fault of the employer: and if the employer has acted in good faith and with ordinary care and prudence in the selection and employment of fit and competent servants, he should not be held liable to one of them for an injury arising from the negligence of his fellow-servant: because it is fair to presume that the compensation was fixed with reference to such risks. But I am entirely unable to see how this consideration can shield other parties not in privity of contract with the person employed, from responsibility for injuries caused by their own negligence or that of their servants in transacting their business.

"As against all other parties except those who are privies to the contract [of employment], it is fair to presume that the servant did not intend to relinquish his right to compensation for injuries he might suffer from their negligence or misconduct; as to these the employer could have no interest in requiring such relinquishment, and consequently the compensation for the service cannot be supposed to have been fixed with reference to them. I, therefore, concur entirely in the views expressed by the Supreme Court of New York in Young v. New York Central R. Co., 30 Barb. (N.Y.) 229, 234 and 235, that the exemption of the employer from liability for injuries caused by one fellow-servant to another, rests solely upon privity of contract, and cannot inure to the benefit of other parties." Felgner v. Anderson, 375 Mich. 23, 34, 35, 133 N.W.2d 136, 142, 143.

The only party that can rely upon the defense of assumption of risk in an action brought for personal injuries is the employer of the employee bringing such action. In this case, the United States Government is relying upon the defense of assumption of risk in the action for

personal injuries brought by plaintiff-appellant, Mickey Lambert. But the Government was not the employer of Mickey Lambert and, consequently, cannot rely on assumption of risk as a defense to Lambert's action. Assumption of risk can be no defense to appellant's action, and, for this reason, among others, I am unable to concur in the accompanying opinion.

Likewise, as a corollary to the foregoing, one who is not the employer of fellow employees has not the right to rely upon the "fellow servant rule" as a defense to an action brought by one of such employees.

The general rule is well stated as follows:

> "If an employee is injured by reason of the joint negligence of a fellow servant and of a third person who is a stranger to the relation of master and servant, the fellow servant rule does not exonerate the third person from liability for his negligence. In other words, where a stranger and a fellow servant negligently inflict an injury upon an employee, the stranger is not entitled to the benefit of the fellow servant doctrine." 53 Am.Jur. 2d, Sec. 300.

We come then to the question of proximate cause. The District Court found that government employees had loaded the steel on the trailer at the government Defense Depot; that the steel sheets were loaded in a dangerous manner, resulting in their toppling against appellant when he started to unload them; that the government employees were guilty of negligence in loading the steel in a dangerous manner; that Anson Long, the employee of Time Freight, Inc., who transported the steel sheets from the government Defense Depot to the freight depot, was also negligent in permitting the trailer to be loaded by the government employees in such a dangerous manner, since it was Long's duty to help load, or observe, or supervise the loading of steel on the trailer, and failing to warn Time Freight, Inc. of such dangerous and improper method of load-

ing, and that appellant Lambert was free of any contributory negligence.

The District Court, however, found that although the government employees were guilty of negligence in loading the steel on the trailer in a dangerous way, their negligence was not the proximate cause of appellant's injuries, since the primary duty of loading or supervising was that of Time Freight, Inc., acting through its employee, the truck driver, Anson Long, and that, therefore, the proximate cause of the accident was the negligence of Long. It entered a judgment against appellant Lambert and in favor of the Government or, in effect, a judgment against appellant of no cause of action.

It is our view that the finding of the District Court that the negligence of the government employees was not the proximate cause of appellant's injuries is not supported by the evidence, is clearly erroneous, and that the judgment should be reversed.

"What is meant by 'proximate cause' is not necessarily that which is next or last in time or place, but that which is a procuring, efficient, and predominant cause. Closeness in causal relation, rather, is the meaning. * * * Rosenbaum v. Shoffner, 98 Tenn. 624, 630, 40 S.W. 1086, and cases cited; 13 Am. & Eng.L. (2 Ed.), 490; 7 Am. & Eng.L. (2 Ed.), 376." Grigsby & Co. v. Bratton, 128 Tenn. 597, 163 S.W. 804. See also DeRossett v. Malone, 34 Tenn.App. 451, 239 S.W.2d 366 (1951).

"Whether the proximate cause of the collision and resulting injuries here involved was negligence of Morton B. Howell, 4th, or of B. S. Whitehurst, or concurring negligence of both, was a matter for the jury to determine from the evidence. There may be more than one proximate cause of an injury. Anderson's Automobile Accident Suit, § 576, p. 715. It is not necessary that two persons shall have acted in concert, or that there shall have been a joint operation or union of act and intent, in order that the negligence of each shall have been a proximate cause of the in-

juries. Anderson, supra, § 574, p. 711, and § 581, p. 718." Whitehurst v. Howell, 20 Tenn.App. 314, 329, 330, 98 S.W.2d 1071, 1081.

In Gannon v. Crichlow, 13 Tenn.App. 281, 289, it is stated:

"Where an intervening efficient cause is a new and independent force which breaks the causal connection between the original wrong and the injury, there is no liability for the original negligence, unless the new cause merely accelerates the original cause which was sufficient to produce the injury. 45 C.J., 930, sec. 490. But it is well settled that the mere fact that other causes, conditions, or agencies have intervened between defendants' negligence and the injury for which recovery is sought is not sufficient in law to relieve defendants from liability. In other words, an intervening cause will not relieve from liability where the prior negligence was the efficient cause of the injury. The test is not to be found in the number of intervening events or agencies, but in their character and in the natural connection between the wrong done and the injurious consequences, and if the injury is the natural and probable consequence of the original negligent act or omission, and is such as might reasonably have been foreseen as probable, the original wrongdoer is liable, notwithstanding the intervening act or event. 45 C.J., 926, sec. 489.

"If the occurrence of the intervening cause might reasonably have been anticipated, such intervening cause will not interrupt the connection between the original cause and the injury. 45 C.J., 934, sec. 493."

In Carpini v. Pittsburgh and Weirton Bus Company, 216 F.2d 404, 407 (C.A.3), Judge Goodrich, in speaking for the court, said:

"There was some point made about the business of separating causal factors. The law on this point was all worked over both by the Supreme Court of Pennsylvania and ourselves in the Pittsburgh-Des Moines cases already cited and that discussion need not be reiterated here. Of course, it is perfectly clear that there can be more than one legal responsible cause for a given injury; otherwise we would have no such thing as joint and several torts. See Restatement, Torts, § 875 et seq."

Section 875 of the Restatement, Torts, sets forth:

"Except as stated in Section 881 [not here applicable] each of two or more persons whose tortious conduct is a legal cause of a harm to another is liable to the other for the entire harm."

Section 879 of the Restatement sets forth:

"Except as stated in Section 881, each of two persons who is independently guilty of tortious conduct which is a substantial factor in causing a harm to another is liable for the entire harm, in the absence of a superseding cause."

This section is followed by the comment:

"A person whose tortious conduct is otherwise one of the legal causes of an injurious result is not relieved from liability for the entire harm by the fact that the tortious act of another responsible person contributes to the result. * * * This is true where both are simultaneously negligent * * * and also where the act of one either occurs or takes place after that of the other."

There may be two proximate causes of an accident. Sedorchuk v. Weeder, 311 Mich. 6, 18 N.W.2d 397; Richards v. Birmingham School Dist., 348 Mich. 490, 83 N.W.2d 643. Concurrent negligent acts which may impose liability on two individuals acting separately need not occur simultaneously, if they are so related as directly to contribute to the accident. Garbe v. Halloran, 150 Ohio St. 476, 83 N.E.2d 217.

As is well stated in 65 C.J.S. Negligence § 110, p. 1193, "[Where] the author of a negligent static condition

should reasonably have anticipated that the primary and active negligence which started the sequence which produced the injury might occur and that it would act together with the static condition and produce injury, the two acts of negligence are both proximate causes of the injury, although they are not concurrent."

It is our conclusion that the negligence of the government employees was one of the responsible causes of the injuries to appellant, and their negligent conduct is not relieved from liability by the fact that the subsequent conduct of the truck driver of Time Freight, Inc. also contributed to the accident.

We come, then, to the question of appellant's contributory negligence. The District Court found appellant was free of any contributory negligence. This is, of course, a finding of fact. In the accompanying opinion, the District Court's finding is set aside, and it is held that appellant was guilty of contributory negligence, and that "the finding of the District Judge that Lambert was not contributorily negligent is clearly erroneous."

We are of the opinion that the finding of the District Court that Lambert was not guilty of contributory negligence was sustained by the evidence, and such finding is binding on this Court if so sustained.

The District Court recited in his finding that appellant Lambert was not guilty of contributory negligence "in that his conduct was never shown to have been in the absence of reasonable and ordinary care under the circumstances."

Appellant Lambert testified that when he looked into the trailer which he was about to unload, he had no notice that the steel was about to fall or could fall, and there was no way he could detect it by looking at it; that there was nothing unusual about the way the steel was stacked; that the steel sheets had been loaded that way before, and there was no indication anything might happen if he began to unload the sheets.

How, then, did this steel about which there was no indication that it would topple upon appellant when he started to unload it, fall upon him when he started to remove the outside sheet, which appellant testified was one of the lighter pieces, less than two hundred pounds in weight? Appellant had "reached over and caught it at the top and pulled it over toward the side-wheeler and, when I did, the rest of the sheets fell over on the side-wheeler and pushed me up against the wall."

The explanation why this happened without any notice that the steel was about to fall, appears in the interesting testimony of Larry Paylor, an employee of Time Freight, Inc., who was one of those who rushed to appellant Lambert's assistance after the sheets had fallen on him, and who helped lift them off. Mr. Paylor testified that, after the ambulance came and took appellant away, he looked behind the sheets "we had set against this wall [of the trailer, and saw] that they had this angle iron or scrap iron—we call all iron scrap iron," and "there was banding around them." He testified also in answer to the question: "Were there any sheets stacked on top of the angle iron?" and replied: "Yes, sir." He further testified that to load steel sheets on top of angle irons would not be proper. "It wouldn't be right; it might get done, but it wouldn't be a proper load."

The explanation of why the steel sheets, improperly loaded, toppled onto appellant as he was unloading them, is clearly explained by Mr. Paylor in his uncontradicted testimony as follows:

"Q. Let me ask you this question, Mr. Paylor: You say you were right there after the accident occurred, is that right?

"A. Shortly thereafter.

"Q. Did you see any angle irons there at that time as part of this load?

"A. There was scrap iron,—what you term 'angle iron' specifically or 'scrap iron,' yes, sir. There was freight loaded in the corner of

the trailer on the floor that created the *arch* some of these sheets were sitting on; *that caused the ones behind against the wall to be overbalanced when the ones on the outside were being taken off the trailer.*

"Q. How do you know they were sitting on it?

"A. All the sheets didn't fall. We set the ones that did fall back up, and later in talking about the accident, after the ambulance had taken Mr. Lambert away, we were looking to see what caused them to fall *because normally they don't.*

"Q. And you could tell they were sitting on top of the angle iron, the sheets were?

"A. Yes, sir; *looking at the end, you could see it was.*" (Emphasis supplied.)

That the steel was dangerously loaded, appears from the undisputed testimony of witnesses. These great sheets of steel weighing eight hundred pounds and more are "flexible." When they were loaded on top of angle irons, these large flexible sheets arched and became "overbalanced" when the lighter ones on the outside of the pile were being taken off the trailer. When the sheets were being lifted off appellant, he was lying on the floor and saw that the sheets had been loaded on top of the angle irons, "which, of course, I couldn't see it before the sheets fell over." He testified the angle irons were hidden underneath the sheets until they "fell over."

Lester Brisco, an employee of Time Freight, Inc., who was also one of those who ran to appellant's aid when the sheets of steel fell upon him, also testified, and was asked on cross examination by government counsel whether the sheet of steel that fell on appellant was eight hundred pounds in weight, which appellant was trying to unload without assistance.

It appeared that an eight hundred pound sheet was too much for one man to unload without help. Government counsel was trying to show that appellant was negligent in trying to unload an eight hundred pound sheet without asking for assistance from another employee. Government counsel asked Brisco:

"Q. Let's take these long crates that fell on Mr. Lambert, what would you decide whether you could do that by yourself or go get help?

"A. In his case, I feel that he was taking smaller pieces off by himself when the other fell upon him.

"Q. When the other fell upon him? How do you know?

"A. By the looks of the freight there was on him.

"Q. How many pieces fell on him?

"A. About eighteen.

"Q. I believe you said one piece that fell on him was 800 pounds; that fell on him?

"A. Yes, sir.

"Q. Eight hundred pounds would be hard to handle by yourself?

"A. It was leaning against the wall with smaller pieces not weighing that much, stacked against it."

Witness Brisco said appellant was unloading "the smaller freight," and the eight hundred pound sheet fell on him. "You can have smaller pieces ahead of the heavy freight that is holding it against the wall."

The conclusion of all the foregoing undisputed testimony is that a load of steel sheets loaded on top of angle iron was a dangerous load; "it wouldn't be a proper load"; "we were looking to see what caused them to fall because normally they don't."

We have then appellant Lambert preparing to unload the steel sheets in the trailer, with no knowledge or notice that the steel was loaded in an improper or dangerous way or that it was likely to topple because the heavier pieces of flexible steel had been loaded on top

of angle irons, that would cause the heavy sheets to arch and become overbalanced, when the lighter sheets of steel on the outside—the lighter freight—was being removed by him; that the lighter sheet or sheets were holding the heavy sheets against the wall; and that it was only when a light outer sheet had been removed, or was being removed, from the stack of steel sheets that the heavy ones, which were first leaning against the wall, became arched and overbalanced because they had been loaded on top of the angle irons—and fell upon appellant causing his injuries.

In all the foregoing there is nothing to show contributory negligence on the part of appellant. The finding of the District Court that appellant was not guilty of contributory negligence is sustained by the evidence.

Confronted by these facts and the finding of fact of the District Court, we are unable to grasp the views expressed in the accompanying opinion, in which none of the above mentioned evidence is alluded to, and the District Court's finding of fact that appellant was not guilty of contributory negligence is set aside and, instead, such finding is held to be clearly erroneous.

There is no testimony or evidence to show that appellant was guilty of contributory negligence. When appellant started to unload the steel, there was nothing to indicate to him that the removal of one of the outside lighter steel sheets would cause the other heavier ones to topple on him. As he testified, when "heavy freight" was brought into his trailer, when he was loading, rather than, as in the present case, unloading, and the government forklift operator brought it in, and, afterward, "goes back on one side and lifts it against the wall," appellant "didn't go around it" and "wouldn't touch it because it could fall." All of this has to do with "heavy freight" which appellant testified he would never try to unload without the assistance of another employee at the Time Freight dock. And the undisputed testimony of other employees was also to the effect that heavy freight required two employees to unload it. Appellant's statement that he would not go into the trailer and "touch" the heavy sheets of metal that the government employees had loaded in the trailer, certainly is no basis for saying he was touching and unloading the heavy freight at the time of the accident, in the face of his undisputed testimony that he did not, nor would not, do such a thing, and the similar uncontradicted evidence of the other employees that they, likewise, would call for the assistance of other employees in unloading such "heavy freight." To quote appellant's testimony that he would not touch any such "heavy freight" loaded by government employees, as an admission that he was touching and unloading such heavy freight, is a negation of his undisputed testimony, and the uncontradicted evidence of other witnesses, and can afford no basis for a holding that appellant is guilty of contributory negligence, especially in the face of the District Court's finding that he was not guilty of any negligence contributing to his injuries.

This conclusion of contributory negligence in the accompanying opinion is contrary to the law, which is to the effect that ordinarily whether the injured person exercised the proper degree of care for his own safety, or whether there was contributory negligence on the part of the injured person is a question of fact for the determination of the jury or other trier of the facts. Contributory negligence is rarely a question of law, and it may be decided as a matter of law only under unusual circumstances.

The District Court found that appellant was not guilty of contributory negligence. This finding of the District Court is set aside as clearly erroneous in the accompanying opinion. We are of the view that the finding of the District Court that appellant was not guilty of contributory negligence is amply sustained by the evidence, and is not clearly erroneous.

It is admitted by everyone that heavy freight, consisting of steel sheets weighing from two hundred or three hundred pounds up to eight hundred pounds or more was too heavy for one man to handle, and in such cases the driver of a truck and trailer would, in the exercise of due care, call upon government employees for assistance in loading, and upon the employees of the freight carrier for help in unloading. This applied to what was referred to as "heavy freight."

If it was "heavy freight"—as appellant testified in the foregoing, it would be brought into the trailer on a forklift, and the forklift operator, a government employee, after bringing it on a forklift "goes back and gets on one side and lifts it up against the wall." Because it was such heavy freight, which appellant or no other employee of the freight carrier was expected to load or unload, because of its weight, appellant stated after such heavy sheets of steel were loaded into his trailer, he "didn't touch it * * because it could fall." Those heavy sheets of steel were never unloaded at Time Freight's loading dock by one man, because they were too heavy to unload alone. This is undisputed.

Government counsel realized this crucial point, and in examining appellant sought to show that he was unloading the eight hundred pound sheet of steel that fell upon him. Appellant, however, testified without contradiction:

"A. By myself I never tried to handle over two or three hundred pounds.

"Q. When you get up into weights above that, what is the practice as far as unloading?

"A. We get someone to help us, and if it is too heavy for that, of course, we get the forklift to take it off * * *.

"Q. Would you just go ahead and tell His Honor what happened when you started to unload that metal?

"A. I took the side-wheeler in to get, of course, the outside piece of freight and it was one of the lighter pieces. Like I said, I don't try to handle one over two or three hundred pounds myself. And I reached over and caught it at the top and pulled it over toward the side wheeler and, when I did, the rest of the sheets fell over on the side-wheeler and pushed me against the wall."

This bears out Mr. Paylor's undisputed testimony:

"There was freight loaded in the corner of the trailer on the floor [angle irons] that created the arch some of these sheets were sitting on, that caused the ones behind against the wall to be overbalanced when the ones on the outside were being taken off the trailer. All the sheets didn't fall."

Mr. Brisco also substantiated the foregoing on cross examination by government counsel:

"Q. What would determine—if you went in there and saw these sheets against the wall, what would determine whether you could move it by yourself or get somebody to help you?

"A. I would try it myself first.

"Q. Regardless of how much it weighed?

"A. Something real big, no, sir.

"Q. Let's take these long crates [heavy sheets of steel] like fell on Mr. Lambert, what would you decide whether you would do that by yourself or go get help?

"A. In his case, I feel that he was taking *small* pieces off by himself when the other fell on him.

"Q. When the other fell on him? How do you know?

"A. By the looks of the freight that was on him.

* * * * * *

"Q. I believe you said one piece that fell on him was 800 pounds; that fell on him?

"A. Yes, sir.

"Q. 800 pounds would be hard to handle by yourself?

"A. It was leaning against the wall *with smaller pieces not weighing that much stacked against it.*

"Q. * * * Do you remember giving a statement to the FBI?

&ast; &ast; &ast; &ast; &ast; &ast;

"A. Yes, sir.

"Q. Do you remember telling [the FBI], 'Loading crates of sheet metal like these was common practice. However, I believe it is dangerous as it makes the unloading hazardous especially when freight as heavy as the one that injured Mr. Lambert.' I take it by that, that is the one that fell upon him. What happened to the one he was taking off, that fell on him, too?

"A. Yes, sir.

"Q. But I assume from this (indicating statement) the one that fell on him weighed 800 pounds; is that right?

"A. Yes, sir that fell on him, *too.*

"Q. Let me ask you, don't you think 800 pounds is a little bit too much for one man to handle by himself?

"A. I would say so, yes, sir.

"Q. You would get some help before you would try to handle it by yourself?

"A. Yes, sir."

*Re-direct examination*

"Q. Are you saying that he was trying to handle that 800 pound crate?

"A. No, that isn't what I said. He was unloading the smaller pieces and that fell on him."

*Re-cross examination*

"Q. The 800 pounds fell on him?

"A. Yes, sir.

"Q. Then that was what he was trying to unload, wasn't it?

"A. I don't think you have the picture. You can have smaller pieces ahead of the heavy freight that is holding it against the wall."

All of the foregoing uncontradicted testimony of appellant and of the other employees shows that appellant Lambert was unloading a light sheet of steel that was stacked against the heavy sheets of metal; that, as he testified, he would have secured help from the other employees of Time Freight, if he attempted to unload the heavy sheets of metal; and that the mere removal of a light sheet of metal which had been stacked against the heavier sheets of metal, was the cause of the toppling of the heavy sheets upon him, because they had been dangerously loaded in an insecure manner on top of angle irons, that caused them to arch and become overbalanced when the lighter sheet which was stacked against them was being removed by appellant.

Government counsel was confused, and, at first, misunderstood the undisputed facts, thinking that appellant's accident was caused by his negligence in removing an eight hundred pound sheet by himself, instead of asking for assistance from the other employees. But he learned from the undisputed evidence that the accident was caused by appellant's removing a light outer sheet that had been stacked against the heavier sheets—and that the removal of the light outer sheet caused the improperly and dangerously loaded sheets of heavy steel to topple over onto appellant.

Nevertheless, government counsel, in spite of the uncontradicted evidence on this point, in their brief on this appeal, still advance, in rather indefinite language, the defense of contributory negligence based upon appellant's removing heavy freight from the trailer without asking for help from his fellow employees. But it is undisputed that appellant was removing only the light freight when the accident occurred.

It is to be remarked again that appellant stated that when *heavy freight* was loaded onto one of his trailers at the Defense Depot, it would "come five or six

or maybe eight on a stack, and it has been brought into my trailer on a forklift; and the forklift operator goes back and gets on one side and lifts it up against the wall.

"Q. And you didn't touch it?

"A. No, sir, I didn't go around it * * * I wouldn't touch it because it could fall."

All of this is concerned with the loading of heavy freight by a forklift operator employed by the Government; and it is entirely consistent with the remainder of appellant's testimony, that whenever he was unloading heavy steel shipments at Time Freight, he would always secure another fellow employee to help him. Nevertheless, on this aspect of the case, the accompanying opinion accepts the argument in the government brief that appellant was guilty of contributory negligence in removing heavy freight from the trailer without having the assistance of other employees.

It is our view that there was no evidence of contributory negligence on the part of appellant; that the finding of the District Court that appellant was not guilty of any contributory negligence was a question of fact and was sustained by the evidence; and that the view, stated in the accompanying opinion, that the District Court was clearly erroneous in its finding that appellant Lambert was not guilty of contributory negligence, is contrary to the evidence.

The Government also contends on appeal that the District Court's finding that the government employees were guilty of negligence was wholly unsupported by the evidence. Such negligence is so plain from the record that it ought to be briefly dealt with.

The government employees at the Defense Depot always loaded the heavy sheets of steel. The only freight loaded by an employee of Time Freight was what he, unaided by another employee, could put in the trailer, himself. This light freight caused no danger. It was the heavy steel sheets that caused the possibility of injuries to another when they were dangerously and improperly loaded.

Anson Long, the driver of the trailer, testified:

"Q. Do you ever have to tell the people at the Depot [the government employees] 'how' as opposed to 'where,' how to load heavy material such as this type?

"A. No; I feel they know and let them do as they please.

\* \* \* \* \* \*

"Q. And these heavier items, you call on the forkdriver to help lift; is that right?

"A. I don't actually call on them; that is their job to do that. I don't say 'It is time for you to get this piece here.' He will know when to put it on there and he will also know what is too heavy for one to handle; and he has delivered this type freight so many times, I don't have to necessarily ask him. * * *

"Q. Let's go back to the load in question. Did you not supervise the loading of the freight? I know you did the freight you put on yourself and particularly the freight that was put on by the forklift operator?

"A. Well, *no*—I could have. I don't think I would interrupt him. If he was putting a piece of freight on the truck, I am not going to tell him how it should be.

"Q. You don't think there was anything wrong with this load?

"A. It is dangerous the way it was loaded, but, again, I say there is no other way to load the trailer."

On cross examination by government counsel, witness was asked:

"Q. Why is it dangerous?

"A. Because the cartons fall over, and did fall and break this boy's legs."

Government counsel then handed witness Long a statement that he had signed. It was a statement, however,

that was prepared by the FBI in the following way. It was not in witness Long's handwriting, but the agent of the FBI would ask a question, and then he would dictate the whole "to another guy," who, Long said, "wrote it down." What the Government was trying to do was to have Long testify that the driver of a truck "had the responsibility of supervising and loading his own freight." By referring to this statement, the questions asked to prove this point were as follows:

"Q. You say, 'The procedure followed in loading the trailers at the Depot is that the driver of a particular truck loads all items on his truck that he can physically handle by himself.' Is that correct?

"A. Yes, sir.

"Q. Items that are too large to handle are placed on the trailer by Depot forklift employees."

Then, government counsel adds, in order to have some basis for arguing that the driver is the only one responsible after the government employees load the steel on the trailer, whether improperly, negligently, or in a dangerous way:

"Q. When this method is used the forklift operators place the freight on the trailer wherever the driver of that truck wants it, as the driver has the responsibility of supervising and loading his own freight. Is that correct?

"A. Yes, sir.

"Q. Is that what you said?

"A. Yes, sir.

"Q. Is that correct?

"A. In a way it is; technically, it is supposed to be my responsibility but, like I said before, since these guys already know what to do, the forklift driver, I don't interfere with their work because I know they're capable to putting freight like it should be or the best they can."

Then witness Long concludes:

"I really do not know from a technical point if the truck driver is responsible or not for the way a trailer is loaded, however, I think he is responsible for the supervision of the loading and I have always just assumed that it would be the driver's responsibility to see that a load was loaded correctly. It is my assumption."

"Responsibility" for the load depends upon seeing that the particular freight corresponds with the particular bill of lading, according to Mrs. Margaret McCann, Traffic Manager at the Defense Depot. She also stated that she knew trailers of freight carriers were loaded completely by the government employees.

It appears from the evidence of government officials and employees, as well as from the evidence of the drivers of Time Freight, that it was the common practice for the government employees to completely load these trailers in the absence of the drivers of Time Freight.

Other employees of Time Freight and government employees testified that the government employees often loaded the trailers, when the drivers were not there.

"Q. You do spot trailers that are loaded completely by employees of the Depot?

"A. Yes, sir."

\* \* \* \* \* \*

"Q. On occasion are trailers spotted out there and completely loaded by lift operators?

"A. Yes, sir."

"Responsibility," in witness Long's mind was responsibility for delivering the steel to the Time Freight dock in an undamaged condition. But the assumption of this responsibility by Long would not relieve the joint tort feasors, the government employees and employee Long, from liability for injuries caused to appellant Lambert by their dangerous loading of the steel, resulting in its toppling on him when he started to remove the first small outside sheet, when he had

no reason to believe that the whole load would fall upon him.

It is plain that the government employees were guilty of negligence in loading the heavy sheets of metal in the trailer which appellant Lambert started to unload. The District Court found the Government to be responsible for this negligent conduct of the government employees. The accompanying opinion accepts the finding of the District Court as to the negligence of the Government. The foregoing is addressed only to the argument on this appeal by the Government that the finding of the District Court "that the government was guilty of negligence was wholly unsupported by the evidence." There is no merit in this contention.

The final point emphasized in the accompanying opinion is that, even though the government employees loaded the freight in a dangerous way likely to topple on the person unloading it, nevertheless, when Anson Long, the driver for Time Freight, Inc., drove the load away and, because he did not, himself, rearrange the heavy freight, "eliminating the hazard," his failure to rearrange the freight was an intervening efficient cause that relieved the government employees (and the Government) from all negligence, which otherwise would have subjected the Government to the damages claimed. "Efficient intervening cause" was never pleaded or argued by counsel for the Government. It appears, for the first time, in the accompanying opinion.

In our opinion, the action of Anson Long in taking the freight from the Government Defense Depot and driving it to the Time Freight loading dock, was clearly not an intervening efficient cause which broke the causal connection between the negligence of the Government and appellant's injury.

As authority for the foregoing conclusion, the sole case of Hurt v. Charles J. Rogers Transp. Co., 164 Ohio St. 323, 130 N.E.2d 824, was cited in the accompanying opinion. Although the question was not submitted or argued on this appeal, we believe the principle in Hurt v. Charles J. Rogers Transp. Co., *supra* has no bearing on the instant case.

The Hurt case was not based on the principle that an intervening agency would relieve a party of responsibility for his negligence, but upon the authority of the Ohio case of Thrash, a Minor, v. U-Drive-It Co., 158 Ohio St. 465, 110 N.E. 2d 419.

Both the *Hurt* case and the *Thrash* case, *supra*, stood for the holding that "where there intervenes between an agency creating a hazard and an injury resulting from such hazard another conscious and responsible agency which could or should have eliminated the hazard, the original agency is relieved from liability. A break in the chain of causation thereby takes place which operates to absolve the original agency." The *Thrash* case cited 65 C.J.S. Negligence § 111, for the rule applicable in the case; and the rule therein stated is as follows:

"Sec. 111(1). Under the doctrine of intervening efficient cause, or insulating the negligence of one person by the subsequent intervention of the active negligence of another, which is well established, and which involves the question of proximate cause, the acts of a third person may intervene and constitute the sole proximate cause of harm, relieving defendant of liability, even though defendant may have been negligent. An intervening cause will be regarded as the proximate cause, and the first cause as too remote, where the chain of events is so broken that they become independent and the result cannot be said to be the natural and probable consequence of the primary cause, or one which ought to have been anticipated. The law will not look back from the injurious consequences beyond the last efficient cause, especially where an intelligent and responsible human being has intervened.

"Not every intervening cause, however, relieves an actor of responsibility, and it is well settled that the mere fact that other causes, conditions, or agen-

cies have intervened between defendant's negligence and the injury for which recovery is sought is not of itself sufficient in law to relieve defendant from liability. The original wrongdoer is liable notwithstanding the intervening act or event if the injury is the natural and probable consequence of the original negligent act or omission, and is such as might reasonably have been foreseen as probable, or if the actor knows, or has reasonable means of knowing, that consequences not usually resulting from the act are likely to intervene so as to cause damage. * * * [An] intervening cause will not relieve from liability where the prior negligence was the efficient cause of the injury.

"Sec. 111(2). An intervening force is one which actively operates in producing harm to another after the negligent act of the original actor has been committed. * * * An intervening efficient cause which relieves a negligent wrongdoer of liability is, and must be, a new and independent force which breaks the causal connection between the original wrong and the injury,[2] and which itself becomes the direct and immediate cause of the injury.[3] If the new cause merely accelerates an original cause which was sufficient to produce the injury, the first cause will still be the proximate cause.[4] In order to break the causal connection, the intervening cause must be one but for which the injury would not have occurred, although the mere fact that the injury would not have occurred without the intervening cause does not of itself relieve the original wrongdoer of liability. * * * The mere omission of a third person to interrupt the result of defendant's act will not amount to an intervening efficient cause,[5] even though such third person is a fellow servant of the person injured, provided neither the third person nor the person injured is a servant of defendant."

As was held in First National Bank of Warren v. Gillen, 7 Ohio Cir.Ct.R., N.S. 33, 17 Ohio Circuit Decisions 609, it is not every intervening cause that relieves the defendant from his negligence. If his negligence is the primary cause of the injury, and the intervening cause was one that in the nature and ordinary course of things should be contemplated as not entirely improbable, then the defendant is not relieved.

If the intervening negligence is merely failure to cure or remove the previous negligence of the defendant, and thereby interrupt its natural consequence, this does not break the connection, nor constitute a self-operating cause of injury. Pennsylvania R. Co. v. Snyder, 55 Ohio St., 342, 45 N.E. 559.

The mere negligent omission by a third party to interrupt the result of the defendant's negligence does not amount to an efficient intervening cause so as to relieve the defendant from liability. Kentucky Independent Oil Co. v. Schnitzler, 208 Ky. 507, 271 S.W. 570, 39 A.L.R. 979; Lee v. Lee, 248 Minn. 496, 80 N.W.2d 529, 67 A.L.R.2d 176.

In the light of the above authorities, let us proceed to analyze the case of Hurt v. Charles J. Rogers Transp. Co., 164 Ohio St. 323, 324, 130 N.E.2d 824, which

---

Among the Tennessee cases cited to uphold the pertinent foregoing statement of the rule set forth in 65 Corpus Juris Secundum are the following:

2. 45 Corpus Juris quoted in Slotnick v. Cooley, 166 Tenn. 373, 61 S.W.2d 462. See Wallace v. Electric Power Board, 36 Tenn.App. 527, 259 S.W.2d 558; 45 Corpus Juris cited in Gannon v. Crichlow, 13 Tenn.App. 281, 289.

3. 45 Corpus Juris quoted in Gannon v. Crichlow, 13 Tenn.App. 281, 288, and in

Read Phosphate Co. v. Vickers, 11 Tenn. App. 146, 157.

4. 65 Corpus Juris Secundum cited in McKinnon v. Michaud, 37 Tenn.App. 148, 155, 260 S.W.2d 721; in Gannon v. Crichlow, 13 Tenn.App. 281, 288, and in Read Phosphate Co. v. Vickers, 11 Tenn. App. 146, 157.

5. Rader v. Nashville Gas Co., 37 Tenn. App. 621, 268 S.W.2d 114. See 45 C.J., p. 937, note 87.

is here relied upon in the accompanying opinion as holding that Anson Long's negligence is an intervening efficient cause that breaks the causal relation between the Government's negligence and appellant's injury.

In our view, Anson Long's negligence could not be considered, by the widest stretch of imagination, an intervening efficient cause that relieved defendant of negligent liability for appellant's injuries.

In the *Hurt* case, *supra,* which the accompanying opinion holds controlling in the instant case, the facts were as follows:

The Ford Motor Company, at Canton, Ohio, loaded steel forgings in wooden containers onto the Rogers Transportation Company's trailer under the supervision of the Rogers Company. James E. Carr was acting as operator and driver of the truck and trailer and semi-trailer, and it was under his supervision that the trailers were loaded. Mr. Hurt, the plaintiff-appellee, was injured as his automobile was passing the truck trailer and semi-trailer owned by the Rogers Company, driven by Carr, when a steel forging bounced or was thrown in some way from the trailer, and crashed through the windshield of plaintiff's automobile, striking him in the face and causing injuries for which he brought suit.

As the opinion in the case recites:

"For some 112 miles after leaving Canton, Carr experienced no difficulty with his load. But, while negotiating an 'S' curve near Cedar Point and traveling at a speed of 45 to 50 miles an hour, Carr noticed some 15 or 20 forgings fall off his outfit, some of which hit the road and bounced as high as the telephone lines (12 or 13 feet). He did not stop at that time to pick up any of the forgings.

"About a mile and half beyond the point where he noticed that the forgings were falling onto the road, Carr stopped at Red Gables, a truck stop near the eastern city limits of San-dusky. There he inspected his load, found one broken box on the semi-trailer, and with the help of another Rogers driver attempted to repair the broken box. To accomplish the repair he knocked boards off two other pallet boxes, one located on the semi-trailer and the other on the full trailer, the latter box containing forgings similar to the one which struck the plaintiff, added a third board which he was carrying on the semi-trailer, and nailed them onto the broken box.

"After making these repairs, Carr continued on his journey to River Rouge. About seven miles west of Port Clinton he had a blowout and stopped to change wheels at the Fremont Oil Company in Port Clinton. The injury to plaintiff occurred about four miles east of Navarre Park (Toledo) at a point where the road was described as 'awful rough.' Carr averaged 40 to 50 miles an hour over the stretch of road from Fremont Oil Company to Navarre Park.

"At Navarre Park, Carr stopped and checked his load. At that time he found forgings, closely similar to the one found in plaintiff's automobile, lying loose on the bed of the full trailer. The box containing these forgings was the one from which Carr had knocked a board to make the repairs at Red Gables.

"We believe that a study of the entire record brings Ford within the rule of the *Thrash case.* Assuming, as we must on the theory presented here, that Ford was negligent in creating a hazard by its method of packing these forgings, we are of the opinion that Rogers was a responsible intervening agent which, after becoming conscious of the hazard, could and should have eliminated it, and by not doing so broke the chain of causation between Ford's negligence and the injury.

"Rogers, the common carrier, had exclusive possession and control of the load throughout the journey and had sole responsibility for its transporta-

tion. Rogers had actual knowledge of every claimed defect attributed to Ford and *was solely responsible for its own willful attempt to correct those defects.*" (Emphasis supplied.)

Obviously, Hurt v. Charles J. Rogers Transp. Co., supra, has no similarity in facts or principles to the instant case. In the *Hurt* case, the chain of causation was clearly broken by the gross negligence of the company's driver, Carr, in continuing to drive the trailer when he could see the forgings falling out and bouncing on the highway without any attempt to stop and retrieve them,—certainly the most negligent conduct that could result in injury and death to innocent motorists—and Carr's crude methods in breaking boxes to contain the forgings, one of the forgings soon afterward falling from the trailer and crashing through the windshield of the plaintiff's car.

In the instant case there was no new and independent force which broke the causal connection between the negligence of the government employees in dangerously loading the truck, and the injury suffered by appellant. All Anson Long did was to load some light freight in the trailer, while all the "heavy freight," which caused appellant's injuries, was loaded by the government employees. Aside from the above, Anson Long only gave a receipt for the load and drove it, without incident, to the loading dock of Time Freight, Inc., where he left it to be unloaded several hours later by appellant Lambert.

In the accompanying opinion it is said that "since the carrier [that is, Long acting for the carrier] accepted the shipment for delivery with full knowledge that it had been dangerously loaded, [he] could and should have eliminated the hazard, and [his] failure to do so has been held to constitute an intervening agency absolving the shipper from liability for injuries to third persons." In other words, Anson Long, after accepting the shipment of steel from the government employees, "should have eliminated the hazard" of the dangerous loading. That

can only mean that Long, as the representative of the carrier, should have gotten into the trailer and wrestled with the eight hundred pound sheets that had been loaded by the government employees, which no employee ever did, or could do, alone—and, because Anson Long did not so "eliminate" the hazard created by the dangerous loading, his failure to do so is an intervening efficient agency absolving the Government from liability to appellant Lambert. I do not believe the law can so be construed to deprive an injured workman of recovery of the damages he has suffered.

The so-called right to supervise the loading by Long, and his giving a receipt for the steel from the Government, is blown up out of all proportion, and cannot, under the authorities cited, be an efficient intervening cause by Anson Long, in breaking the causal connection between the Government's negligence and the injuries suffered by appellant Lambert. Whatever Long's negligence was, it concurred with the negligence of the Government and, as such, both Long and the Government were joint tort-feasors, and either or both are liable.

There was no intervening force, for which Anson Long was responsible, which actively operated in producing harm to appellant after the negligent loading by the government employees.

The negligence of the government employees was one of the proximate causes of injury to appellant. The negligence of Long in not supervising the loading by the government employees was not an efficient intervening cause that would result in absolving the Government from liability. The mere act of omission of Anson Long does not amount to an intervening efficient cause. And his merely driving the trailer to the Time Freight loading dock could not, in any acceptance of the term, amount to an "intervening efficient cause" that would absolve the Government from its negligence.

Both the government employees and Anson Long were joint tort-feasors and both were negligent. There may be two proximate causes, and the negligence of

the Government was a proximate cause of Lambert's injuries. The Government is, therefore, liable to appellant for damages arising out of his injuries.

We have demonstrated that appellant Lambert was not guilty of contributory negligence, and the District Court's holding to this effect is sustained by substantial evidence. There can be no defense, as we have shown, based on assumption of risk, or on the fellow-servant rule, in such a case as this. There was no intervening efficient cause between the negligence of the Government and the injuries suffered by appellant.

There, accordingly, is no question left in the case except the amount of damages, which appellant sustained, upon which no finding was made. The case should, therefore, be remanded to the District Court for trial before the court, confined to the single question of the amount of damages to which appellant is entitled, under the instructions of this court, and in conformity with this opinion.